**Don L. BROOKS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–1561.

District of Columbia Court of Appeals.

Argued April 2, 2009.
Decided March 15, 2012.

Peter H. Meyers, Washington, DC, for appellant.

Christopher R. Kavanaugh, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Elizabeth Trosman, and

Gary M. Wheeler, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,[*] RUIZ, Associate Judge, Retired,[**] and FARRELL, Senior Judge.

RUIZ, Associate Judge, Retired:

Don L. Brooks was indicted for first-degree murder while armed[1] and related weapons offenses[2] arising out of the shooting death of Brian Taylor on September 16, 2003. Appellant's first trial resulted in a mistrial after the jury was unable to reach a unanimous verdict; after a second trial on the same charges, the jury found appellant guilty on all counts.[3]

Appellant's principal argument on appeal is that the government should not have been permitted to introduce at his second trial, in lieu of live testimony, the recorded testimony that was presented in the first trial by the key prosecution witness. We agree with appellant that it was error to admit the prior recorded testimony because the government did not adequately demonstrate that the witness was "unavailable" at the time of the second trial, where the government's efforts to secure her attendance at trial were not reasonably diligent in light of her critical importance to the government's case. Appellant was therefore denied the right, guaranteed by the Confrontation Clause of the Sixth Amendment, to have the jury observe the demeanor of the witness firsthand. Denial of the right to have the jury assess the credibility of the sole eyewitness in this first-degree murder case was not harmless. We, therefore, reverse and remand for a new trial.[4]

## I. Factual Background

### The Government's Case

All of the evidence that directly implicated appellant in the shooting was supplied by Henrietta Harling, an eyewitness whose testimony from the first trial was read to the jury at the second trial. According to that testimony, on September 16, 2003, at approximately 1:45 a.m., Harling was walking to her apartment located at 309 54th Street, N.E., when she noticed five men drinking in a parking lot. Harling knew four of the men as "Don [appellant], Greg, Shawn, and Roy," but did not know the fifth man, Brian Taylor. Harling overheard appellant arguing with Taylor

* Chief Judge Washington was selected to replace Judge Kramer on the division after her retirement.

** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. D.C.Code §§ 22–2101, –4502 (2001).

2. Possession of a firearm during a crime of violence, D.C.Code § 22–4504(b); carrying a pistol without a license, D.C. § 22–4504(a); possession of an unregistered firearm, D.C. § 7–2502.01; and unlawful possession of ammunition, D.C. § 7–2506.01(3).

3. Appellant was sentenced to a total term of 636 months imprisonment and five years of supervised probation: 540 months of imprisonment with five years of supervised probation for first-degree murder while armed; and ninety-six months imprisonment and three years of supervised probation for PFCV, to be served consecutively. In addition, appellant was sentenced to concurrent terms of twenty-eight months of imprisonment and three years of supervised probation for carrying a pistol without a license, twelve months of imprisonment for possession of an unregistered firearm, and twelve months of imprisonment for unlawful possession of ammunition; and a fine of $400 to be paid to the Victims of Violent Crimes Compensation Fund.

4. We do not reach appellant's other claims on appeal, that the trial court erred in admitting hearsay evidence from a different witness and that the prosecutor misstated the evidence in closing argument.

"about turf," telling him, "man, you don't come down here and be selling nothing, this is my turf, our turf." As appellant walked to his car, he told Taylor, "when I come back, you'll be dead"; he then drove away.

Approximately forty-five minutes later, from inside her apartment, Harling heard a car door slam outside. She looked out of her window and saw appellant holding a gun by his side as he walked toward Taylor. Harling heard appellant tell Taylor, "Nigger, I told you when I get back, you're dead." Harling testified that appellant was "right up on [Taylor] when he held his gun "[u]p to his head" and "just shot him." Several shots were fired and Taylor fell to the ground; he died shortly thereafter.

Police arrived in response to a radio call, and the group, including appellant, dispersed from the scene. Harling came out of her house and identified herself to a police officer as a witness. On January 14, 2004, Detective James Broadbent of the Homicide Unit of the Metropolitan Police Department (MPD) presented a photo array to Harling, from which she identified appellant as the person who shot Taylor.

Appellant was arrested on February 17, 2004, and transported to the D.C. Violent Crimes Branch, where he waived his *Miranda*[5] rights prior to being interrogated. Appellant denied any involvement in the murder, and said he had rented a car on the day of the murder and had driven to New York with friends.

*The Defense Case*

The defense presented one witness, Parrish Taylor, who knew both appellant and the decedent, who was "like an uncle" to him Taylor testified that he was outside on a hill close to the scene of the murder

when he heard gunshots and saw "a couple of dudes" run past him, one of whom was carrying a gun. He recognized the two men as "Raymond and Rob" and did not see appellant outside that night.

## II. Analysis

Appellant argues that the trial court should not have permitted the introduction of Harling's transcribed testimony from the first trial at his second trial when she failed to appear at the retrial. Appellant argues that the trial court erred in finding that Harling was "unavailable" for purposes of the Confrontation Clause and the hearsay exception for prior recorded testimony. Specifically, appellant contends that the government's efforts to secure her presence at trial fell short in light of the importance of her testimony, the seriousness of the charged crime (first-degree murder), and the government's awareness that Harling was a reluctant and unreliable witness. The government counters that appellant waived this claim and the court should consider it, if at all, for plain error. In addition, the government argues that it should not be penalized for Harling's disappearance. We conclude that appellant did not waive his claim and preserved his objection, that under the circumstances the trial court abused discretion in admitting the prior testimony of the government's key witness, and that appellant was prejudiced by the witness's absence at his retrial.

### A. *Waiver; Plain Error*

Appellant's second trial began on Monday, August 21, 2006. On the first day, the trial judge announced that the trial was to be completed by the end of the week because of his planned leave the following week.[6] Jury *voir dire* took place

---

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The trial court told counsel, "I'm just letting you all know before I get started, I'm not

that day, and opening statements and testimony from several minor government witnesses consumed the following morning, Tuesday. Following the lunch recess, the prosecutor notified the court that although the government's main witness, Henrietta Harling, had been in court earlier in the day, she was not in the courtroom and could not be located. The government then asked for permission to locate her overnight and to reconvene the following morning.

On Wednesday, August 23, 2006, the prosecutor informed the court that its efforts to locate Harling the previous night, after the court adjourned, had been unsuccessful. The prosecutor represented that investigators had contacted her family, had gone to two former addresses and to her former employer, and had visited her former boyfriend. The police were "still looking, but [could not] find her." The prosecutor then moved that Harling be declared "unavailable" so as to allow the prosecution's case-in-chief to proceed by reading the transcript of her previous trial testimony to the jury. The trial judge assumed "hypothetically" that Harling had "voluntarily chose[n] not to appear," and began to explore the timing and manner of the presentation of her prior testimony to the jury. Defense counsel objected and the following colloquy ensued:

Defense Counsel: I think the issue is whether she is unavailable, not whether or not she is here.

. . . .

And it seems to me that what the [prosecutor] is telling you is, they can't find her, but they are not telling you that she is unavailable and I think there's a distinction there. I don't think the testimony should be read. If they don't have her here, they can proceed with what they've got.

Court: That's not true. When a witness leaves, who's under court order, she didn't have a right to just walk away. That's not her prerogative. That order is essentially through me, through this documentation right here. She d[oes]n't have a right to walk away.

Defense Counsel: I agree with the Court, but what I'm saying is, is walking away, the remedy is they can ask for a bench warrant. They can go out and look for her and try to bring her in, but as far as reading her testimony, because she turned around and walked away, it seems to me that doesn't indicate she is not available.

Court: Well, how is she available, if the witness is dead, what would you do, you would read the witness's testimony.

Defense Counsel: If the witness was dead, she would be unavailable.

Court: Well, if you can't find her, do you think the jury is going to sit here and wait for us to find her? No. She's unavailable in my view, unless you've got some cases that say that's not unavailability. We [are] not going to wait three or four days while we're looking for some witness.

Defense counsel informed the trial judge that "there's some case law that indicates that [the government] can have some time to look for her if they want to."[7] After

planning on stopping. I'm going to get this case tried and finished this week, because I'm going to be on leave next week, so if the witness is not here and this, that and the other, I don't want to hear it."

7. Defense counsel expressed his additional concern that if the testimony of the witness was read from the transcript of the first trial, the jury would become aware that there had been a previous trial, and might assume appellant was found guilty, but that the conviction had been reversed on appeal, and he was back in trial. This (mis)information, he argued, would further prejudice appellant with

noting that "any number of things could have happened," the trial court commented:

The question is do we have the facility to get her back here in a reasonable amount of time given what we have. Now, you know, I could recess for a while, but I'm not going to recess forever. Now, once that recess runs out [the prior testimony will be read.]

The trial judge then stated,

So I think what I'm going to do is give you a chance to see if you can check with the hospitals and check with the police department and see if she got locked up. A lot of times people don't come back, because they are locked up. You don't know

. . . .

So I think at a minimum, you should check the hospitals, check to make sure she's not locked up. It's a little hard to get locked up in the surrounding jurisdiction unless she went far away during the lunchtime. If she's not locked up or in the jail, if we don't find her there, then I think there's some basis to suggest that the witness was (sic) voluntarily absented herself from these proceedings for whatever her reasons might be.

Defense counsel suggested that calls should also be made to Virginia because Harling had previously been arrested there, but the prosecutor dismissed the suggestion, saying it had been established at the first trial there were no charges pending against Harling. The trial judge offered to allow the government time to determine overnight whether she had been admitted to a local hospital or jail; the judge anticipated, however, that Harling's testimony would be read into the record the following day, as the government has not "given me any real expectation . . .

the second jury. The trial court offered to

that you can locate her." The prosecutor readily agreed that he did not expect to find her. After discussing the order of witnesses, and asking the government to "make every effort that you can" before starting to take testimony either the following day, or later that day, defense counsel stated that "[o]ur preference, Your Honor, would be to plod on. If all they have to do is check with some hospitals to see if she's there, that involves just making perhaps five or [ten] telephone calls." (emphasis added). The trial court said it was "willing to wait . . . to do that," and that the prosecutor should "have that for the record after lunch." Defense counsel then agreed that after the phone calls were made during the lunch recess, the transcript of Harling's testimony at the first trial would be read to the jury. After lunch, the prosecutor stated that he had checked the jail and five hospitals in the District of Columbia, all of which reported that Harling was not present. Harling's testimony from the first trial was then read to the jury.

■■■ The record does not support that appellant waived his claim that Harling was "unavailable," which, as we discuss *infra* is a constitutional and evidentiary prerequisite for admission of prior recorded testimony. "[A] strong presumption exists against waiver of a constitutional right," *Turner v. United States,* 459 A.2d 1054, 1056 (D.C.1983), and "waiver determinations are to be carefully scrutinized." *Nelson v. United States,* 649 A.2d 301, 309 (D.C.1994). For a waiver to be valid, the government must prove "an intentional relinquishment or abandonment of a known right or privilege." *Thomas v. United States,* 914 A.2d 1, 19 (D.C.2006) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The

give an instruction to avoid jury speculation.

colloquy among the judge, prosecutor, and defense counsel does not demonstrate that, by agreeing to "plod on," appellant conceded that Harling's prior testimony should be read to the jury, or abandoned his objection that the government had not done enough to prove Harling was "unavailable" as the term is properly understood in this context. Defense counsel objected to the reading of Harling's prior testimony to the jury when the prosecutor proposed it, and reiterated the distinction between her absence and her unavailability ("because she turned around and walked away, . . . doesn't indicate she is not available"). The trial judge and the prosecutor both had said they had "no expectation" that Harling would be found. The trial judge had expressed his reluctance to continue the trial longer than the time necessary to phone D.C. hospitals and the jail because the jury would not "sit here and wait" while further efforts were made to find the witness, and the judge had already indicated that the trial had to be completed by the end of the week because of his planned absence the following week. See note 6, *supra.* Defense counsel reasonably perceived that the phone calls that remained to be made were *pro forma* ("If all they have to do . . ."). In our view, a fair reading of the record shows that counsel eventually acquiesced to the course the trial judge had charted, but did not "intentionally relinquish" his objection to admission of the missing witness's prior testimony.

■ The government argues that our review is limited to plain error because defense counsel's objection at trial was not sufficiently specific to apprise the trial court that the objection was to the inadequacy of the prosecution's efforts to prevent Harling from disappearing. We find this argument unpersuasive as well. While an objection must be timely, *Puckett*

*v. United States,* 556 U.S. 129, 134, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009), and reasonably specific, *see Irick v. United States,* 565 A.2d 26, 34 n. 22 (D.C.1989), a party is not required to cite chapter and verse of the law the trial court is to apply. Here, counsel timely objected to admission of Harling's prior recorded testimony and argued that the government had not done enough to show Harling's unavailability, pointing to the distinction between her absence and the government's efforts to find her. As counsel pointed out, the government "can proceed with what they've got" or they "can go out and look for her and try to bring her in." This was enough to apprise the court of the nature of his objection. Once an objection is lodged, and its basis asserted, it is the judge's responsibility to exercise judgment in accordance with applicable legal principles. *See, e.g., Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979). Often counsel will offer relevant legal principles and citations, or the judge may request additional legal argument or briefing, or take some time to research the matter in chambers; but if an objection is preserved, our review is of the trial court's ruling, not counsel's performance. *See, e.g., Hunter v. United States,* 606 A.2d 139, 145 (D.C.1992) ("[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel.") (quoting *Irick,* 565 A.2d at 33). Here, counsel did more than state his objection. He expressed dissatisfaction with the government's proposed actions and suggested to the trial judge that the prosecutor should ask for a bench warrant and be given additional time to make further efforts to locate the witness, adding that the prosecutor should also check in Virginia.

■■ Finally, we reject the argument that defense counsel's acquiescence prevented development of an adequate record

882

of the government's efforts. The burden was on the government to establish that the witness is unavailable. *See Coppedge v. United States,* 114 U.S.App.D.C. 79, 84, 311 F.2d 128, 132 (1962); *United States v. Montgomery,* 998 F.2d 1468, 1473 (9th Cir. 1993) ("[I]t is not defendant's burden to show a failure of due diligence.") (citing *United States v. Suarez,* 939 F.2d 929, 932 (11th Cir.1991), and *United States v. Pizarro,* 717 F.2d 336, 343 (7th Cir.1983)); *Velarde–Villarreal v. United States,* 354 F.2d 9, 13 (9th Cir.1965). Defense counsel's acquiescence came after the government's overnight search, after the prosecutor and the trial judge said they had "no expectation" of finding the witness, after the prosecutor went along with the trial court's suggestion that a few calls be made to hospitals and the jail in D.C., and after the prosecutor rejected defense counsel's suggestion to search in Virginia. There is no indication, in other words, that the prosecutor would have taken any action beyond what had already taken place and the few calls about to be made. Counsel cannot be faulted for believing that, by then, the die had been cast, and that the question that remained was whether Harling's testimony would be read to the jury the same day, after the lunch recess, or the following morning. *See United States v. Freeman,* 357 F.2d 606, 613 (2d Cir. 1966) (finding that colloquy "sufficiently enlightened the court as to the point being raised," and that any further showing would have been "an exercise of futility" once objection was made and it was "probable" that court would adhere to decision).

Thus, we conclude that appellant did not waive his right to confront the principal witness against him, and preserved his objection that the government's efforts were inadequate to establish she was unavailable. We turn to consider the merits of the claim on appeal that the trial court abused discretion in allowing Harling's pri-

or testimony to be admitted in lieu of her taking the stand before the jury.

## B. *Unavailability*

 The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him," U.S. CONST. amend. VI. As interpreted by the Supreme Court, the Confrontation Clause precludes the prosecution from introducing prior testimonial statements against a defendant unless: (1) the defendant has had (or has forfeited) the opportunity to be confronted with the witness who made the statement, and (2) the witness is unavailable to testify at trial. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As an evidentiary matter, prior recorded testimony may be admitted into evidence as an exception to the rule prohibiting hearsay statements only upon the satisfaction of four requirements: (1) that the declarant is unavailable at trial, (2) that the former testimony was given under oath or affirmation in a legal proceeding, (3) that the issues in the proceedings are substantially the same, and (4) that the party against whom the testimony is offered had the opportunity to cross-examine the declarant at the former proceeding. *See Warren v. United States,* 436 A.2d 821, 825 (D.C.1981). Thus, as a matter of constitutional and evidentiary law, "unavailability" of the witness is "a necessary precondition" to the introduction of prior testimony. *United States v. Lynch,* 163 U.S.App.D.C. 6, 18, 499 F.2d 1011, 1023 (1974).

 With respect to both the Confrontation Clause and hearsay challenges, the parties agree, as do we, that because appellant was able to—and did—cross-examine Harling during the first trial on the same charges, the only issue on appeal is whether she was "unavailable" for the sec-

ond trial. As the party proposing to introduce Harling's prior testimony, the government had the burden in this case of establishing that the witness was unavailable. *See Coppedge*, 114 U.S.App.D.C. at 84, 311 F.2d at 132. That burden, we have said, is "substantial." *Stack v. United States*, 519 A.2d 147, 156 (D.C.1986).

■■■■■ We review under an abuse of discretion standard "the admission of a witness's prior recorded testimony due to the witness's present unavailability." *Williams v. United States*, 881 A.2d 557, 564 (D.C.2005). That a witness is in fact absent is not enough to permit introduction of prior testimony, even if cross-examined, without the usual requirement that the witness be present at trial. Rather, in deciding whether a witness is "unavailable" to permit an exception for this purpose, the trial court must determine whether the prosecution made a "reasonable, good faith effort" to secure the witness's presence at trial. *Id.; Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).[8] What is "reasonable" must be evaluated in the context of the specific circumstances presented. Thus, depending on the circumstances surrounding the witness's absence, the determination may take into account the government's efforts *prior* to the witness going missing, *see United States v. Mann*, 590 F.2d 361, 368 (1st Cir.1978) ("Implicit ... in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent."), and *after* she has disappeared. *See Lynch*, 163 U.S.App.

D.C. at 18, 499 F.2d at 1023. On appeal, "[t]he issue is whether there was sufficient evidence to support the trial judge's ruling that the government met its burden to show [the witness] was unavailable...." *Stack*, 519 A.2d at 156.

■■■■ In determining whether the prosecution has made reasonable, good faith efforts to locate the missing witness and secure her appearance at trial, the court conducts a context-and fact-specific analysis in the case. Where the evidence indicates that a critical government witness is physically and mentally capable of testifying and present within the jurisdiction of the court, "the prosecution must demonstrate that it has been unable to obtain the witness's presence through a search exercised both in good faith and with reasonable diligence and care. In the ordinary case, this will require a *search equally as vigorous* as that which the government would undertake to find a critical witness if it has no [prior] testimony to rely upon in the event of 'unavailability.'" *Lynch*, 163 U.S.App.D.C. at 18, 499 F.2d at 1023 (emphasis added).

■■■■ Confrontation Clause concerns are heightened with the significance of the missing witness to the prosecution's case. *See United States v. Foster*, 300 U.S.App. D.C. 78, 80, 986 F.2d 541, 543 (1993) ("The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause...."); *Lynch*, 163 U.S.App. D.C. at 18–19, 499 F.2d at 1022–23 (confrontation rights are "especially cogent when the testimony of a witness is critical

---

**8.** *Crawford* did "not change the definition of 'unavailability' for Confrontation Clause purposes; pre-*Crawford* cases on this point remain good law." *United States v. Tirado–Tirado*, 563 F.3d 117, 123 n. 3 (5th Cir.2009); *see also Primeaux v. Workman*, 2010 WL 3942395 (W.D.Okla. Oct. 7, 2010) ("Even

though *Cook* [*v. McKune*, 323 F.3d 825 (10th Cir.2003)] relied upon *Ohio v. Roberts*, [448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)], for its holding on unavailability, *Crawford* does not affect the unavailability analysis.").

to the prosecution's case against the defendant"). Harling's importance to the prosecution's case cannot be overstated. As the prosecutor argued in moving to admit her testimony from the first trial, Harling was the "only eyewitness" and "as to the identifications made, the statements that she made and the eyewitness testimony, [the prosecution could not] go any further without [Harling]." At oral argument before this court, the government conceded that the prosecution "had no case" absent Harling's testimony.[9] In light of the importance of Harling's testimony to the prosecution's case, appellant's rights under the Confrontation Clause and the prejudice that would result from violation of those rights, were heightened. *See Foster,* 986 F.2d at 543; *Lynch,* 163 U.S.App.D.C. at 17, 499 F.2d at 1022. The government's obligation to take steps to produce the witness had to correspond to the importance of the witness and the potential prejudice to the defendant if she did not testify.

 It is also relevant that appellant was charged with and found guilty of first-degree murder (among other offenses) and sentenced to fifty-three years of imprisonment, based on the testimony of the missing witness. *See McCandless,* 172 F.3d at 266 (noting that "special sensitivity to Confrontation Clause concerns is appropriate where the consequences of a conviction based on the absent witness' testimony are grave"). There is no "bright line" rule that a missing substantial witness in a first-degree murder can never be found to be "unavailable" for purposes of admitting prior recorded testimony, for example, where the witness has died or has invoked

the Fifth Amendment privilege against self-incrimination. *See Pizarro,* 717 F.2d at 351. But the seriousness of the charged crime is a factor that weighs heavily—and in certain cases may be determinative—in deciding whether the government's efforts were sufficient to protect the defendant's constitutionally grounded interest in confronting witnesses to present a defense.

 The rights safeguarded by the Confrontation Clause center on the right to cross-examine a witness for the government's case. Appellant exercised the right to cross-examine Harling in the first trial. But it is not only the right to cross-examine, but the right to have the witness testify before the jury that the Confrontation Clause guarantees. "The Confrontation Clause ... gives defendants the right to have the jury observe the demeanor of witnesses against the accused." *Jones v. United States,* 441 A.2d 1004, 1006 (D.C. 1982) (citing *Barber,* 390 U.S. at 725, 88 S.Ct. 1318; *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). It is axiomatic that "[d]emeanor is of the utmost importance in the determination of credibility of a witness." *Gov't of the Virgin Is. v. Aquino,* 378 F.2d 540, 548 (3rd Cir.1967). As the Ninth Circuit has stated:

> Underlying both the constitutional principles and the rules of evidence is a preference for live testimony. Live testimony gives the jury (or other trier of fact) the opportunity to observe the demeanor of the witness while testifying. William Blackstone long ago recognized this virtue of the right to confrontation, stressing that through live testimony,

---

9. The prosecution's only other evidence linking appellant to the crime was Mohamed Soumare's testimony. Soumare, an Assistant Rental Manager of Darcars Ford in Lanham, Maryland, testified that while appellant was incarcerated, appellant had called and asked that Soumare fabricate a rental agreement for the dates of September 15–19, 2003, which included the day of the shooting. Appellant told Soumare that he was "in trouble" and asked him on two more occasions to fabricate a contract, but Soumare refused to do so.

"and this [procedure] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behavior, and inclinations of the witness." Transcripts of a witness's prior testimony, even when subject to prior cross-examination, do not offer any such advantage, because "all persons must appear alike, when their [testimony] is reduced to writing."

*United States v. Yida,* 498 F.3d 945, 950 (9th Cir.2007) (quoting 3 William Blackstone, *Commentaries on the Laws of England* 373–74 (1768)).

Even a complete reading of Harling's testimony, in other words, would not convey to the jury in the second trial the full extent of her demeanor and tone when she testified at the first trial. The jury's ability to observe a witness's demeanor is important in every case, and it is particularly evident in this case where the trial judge noted that Harling "testified, but she was doing everything she could not to. I remember that. That's why we're back here again." The trial judge knew this, however, only because he had been able to observe Harling as she testified at the first trial. But the reluctance and halting quality of Harling's testimony on the stand at the first trial would not come across to the jury in the second trial because of the inherent limitations of a written transcript. As the trial court further noted, "reading [the transcript] probably takes a lot less time than the witness actually testifying, because any hesitation won't be incorpo-

rated into the transcript ... so it's going to [go] much faster." The transcript does show that Harling was evasive or confrontational on the stand when questioned by defense counsel about her use of different aliases, birth dates and social security numbers, and she was asked about inconsistencies between her trial testimony and her testimony before the grand jury.[10] But what the cold transcript cannot reveal are nuances of tone, body language, eye contact and other indicia from which jurors can draw, based on their own experience, to infer the reasons for the witness's evasiveness or pugnaciousness. *See In re Temple,* 629 A.2d 1203, 1208–09 (D.C.1993) ("The factfinder who hears the evidence and sees the witnesses is in a better position to make [credibility] determinations, having the benefit of those critical firsthand observations of the witness'[s] demeanor or manner of testifying which are so important to assessing credibility."). Several notes received during deliberations in appellant's first trial, where the jury was unable to come to agreement, make clear the jurors thought that careful assessment of Harling's credibility was critical to the prosecution's case. The first note requested Harling's testimony before the grand jury, a second note asked for additional portions of Harling's grand jury testimony, and a third note explained that "[t]his case hinges on Henrietta Harling's testimony ... some jurors absolutely believe her and some absolutely do not."

In this case, the importance of the witness, the seriousness of the charges and

---

**10.** For example, when defense counsel attempted to elicit how long she had used the alias "Connie Harris," Harling refused to answer. When asked where she obtained that name, she replied "It's none of your business, sir." She also replied "[y]ou know, you need to stop trying to trip me up with all of this, okay?" After answering several of defense counsel's questions with questions of her own, the trial court repeatedly had to interject: "[m]a'am, don't ask any questions; just answer the questions." Defense counsel then asked "Miss, are you under the influence of anything right now? Alcohol, any kind of narcotic? Are you under the influence of anything?" to which Harling replied, "Of you ... I'm under the influence of you."

the limited ability of the transcript to convey the witness's problematic demeanor at the first trial, add weight to the interests protected by the Confrontation Clause and the evidentiary rule against admission of prior recorded testimony, and required a showing of similarly weighty efforts to discharge the government's obligation. As we now discuss, in this case the government did not meet its burden of demonstrating that it made reasonable, good faith efforts to secure its key witness's presence at appellant's second trial.

## C. The Prosecution's Efforts to Ensure the Witness's Presence at Trial

 The determination that a witness is "unavailable" is a legal conclusion that is a precondition to admission of prior testimony, and it is measured by a fact-specific inquiry into the proponent's efforts to secure the presence of the witness at trial. "The lengths to which the prosecution must go to produce a witness, 'is a question of reasonableness.'" *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (quoting *California v. Green*, 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring)).

Based on the record, it is clear to this court, as it was to the trial court, that Harling was a reluctant witness at the first trial who did not want to testify in court. This does not mean, however, that her absence at the second trial lessened the government's burden of showing that she was "unavailable." To the contrary, a witness's known reluctance to testify adds to the government's burden to show that it made "reasonable, good faith efforts" to secure her appearance because it makes her failure to appear voluntarily all the more foreseeable. The government argues that, despite her reluctance, Harling in fact appeared at both trials, so that appellant's insistence that she was unreliable and that the prosecutor failed to take additional *ex ante* precautionary measures to insure her appearance rests largely on hindsight.

We need not dwell in this case on whether the prosecution should have taken preventive measures to secure Harling's presence *before* she went missing, equal to what it would have done for the sole eyewitness if Harling's prior testimony had not been available.[11] Instead, we

11. Harling had failed to appear to testify at appellant's first retrial date, which had been scheduled for May 24, 2006, and during the investigation she had lied to the police about her identity. And this was not the first time she had failed to show up; in another criminal case, she had been arrested on a bench warrant, under a different name (one of several aliases), for failure to appear as a witness. Appellant argues that the pretrial practices followed with respect to Harling in this case were inadequate, too hit-or-miss, in light of the critical importance of her testimony to the government's case and questions about her reliability. Appellant cites the following examples:
(1) The government did not issue a fresh subpoena to inform Harling that she needed to appear at the rescheduled trial date, after she failed to appear for trial in May. The trial court recognized that Harling presented a

risk and admonished the prosecutor for not issuing a new subpoena, stating, "I wouldn't be taking a chance with any witness ... especially a witness like that, because you [had] already seen in the first trial she didn't want to testify." At oral argument before this court, government counsel recognized that "of course it is best practice to have all witnesses subpoenaed for trial .... it is not burdensome ... [and] it could inform the person that they need to be there."
(2) The prosecutor told the court that he had spoken with Harling by phone at 7:45 p.m. the night before she was to testify in court on August 22, 2006. The prosecution had not made any in-person contact with Harling between the May 2006 trial date (when she failed to appear) and the rescheduled August 2006 trial date. The record is unclear as to whether the prosecution communicated with Harling between May and the night before the

focus primarily on what we conclude were the government's inadequate efforts, *after* Harling left the courthouse, to find her and bring her back to court. Once Harling left the courthouse and did not return to testify after the lunch recess, the government tried overnight, unsuccessfully, to contact her through family and former addresses; the next day, at the trial court's suggestion, the government called D.C. hospitals and the jail. It had no other leads, proposed no additional efforts, and did not ask for additional time. The prosecutor expressed that he had "no expectation" Harling could be found. These efforts, we conclude, were insufficient to discharge the government's obligation to show the witness was "unavailable" for purposes of the Sixth Amendment.

The trial court and the prosecutor seem to have been of the view that if Harling "voluntarily" chose not to appear, the government's efforts could be limited to ensuring that she had not been detained involuntarily. The witness's "evasiveness," however, is not the same as the government's burden to show the witness' "unavailability," which is a measure of the government's efforts. *Lynch*, 163 U.S.App. D.C. at 17, 499 F.2d at 1024. In *Hardy v. Cross*, 565 U.S. ——, 132 S.Ct. 490, 493–94, 181 L.Ed.2d 468 (2011) (per curiam), the Court held, on habeas review, that the state court had not erred in finding a witness unavailable where the witness "ha[d] made it impossible for anybody to find where she is," and government had been in "constant contact" with the witness and her mother before her disappearance, and after she disappeared, over a period of several weeks before trial, government had made "constant personal visits ... at all hours of the day and night" to her home, and other personal visits and telephone calls with parents and various family members, visited her ex-boyfriend's family 40 miles away, and made multiple calls to school, hospitals, and other relevant state government agencies. In this case, on the other hand, although the witness made herself scarce, it was not shown that it was "impossible" to find her, and the government's efforts were paltry.

Here, the fact that Harling had been seen in the courthouse a couple of hours before she was to testify (and was apparently not hospitalized or under arrest) meant it was likely that she was in the vicinity and that it was possible to locate her. The government had been able to secure Harling's presence on prior occasions and make her available to testify when it needed her, at the first trial, and there is no reason to believe that more diligent or extended efforts would not have been successful. But it appears the government's interest had flagged. It made a routine overnight search using the indirect contacts it had to get in touch with her, see note 13, *supra*, and, the next day, made a few calls to D.C. hospitals and the jail.

August trial date, and if so, how many times or to what extent.

(3) The contact information that the prosecution had for Harling consisted of: a former employer, a former boyfriend, and former addresses where she "ha[d]n't lived ... for a while." The prosecution relied on calling and leaving messages with her family, having her family forward messages to her, and then waiting for Harling to respond.

(4) The prosecutor allowed Harling to leave the courthouse right before she was to be called to the stand. At a minimum, appellant asserts, the prosecutor should have asked the judge to warn Harling that she was under subpoena and obligated to return to court, and assigned a person to ensure her return. The trial court thought the prosecutor had taken a risk allowing Harling to leave for lunch unescorted, stating, "you know, I'm going to put somebody to be watching this witness if my case depends on it." The prosecutor "agreed" with the judge's position.

However, when defense counsel suggested that calls also be made to Virginia, where Harling had been arrested in the past, the prosecutor dismissed the suggestion, based on stale information from the first trial, held eight months earlier, that there were no charges pending against her. And even though the prosecutor at one point thought Harling had told him she needed to see her lawyer during the lunch break, there is no evidence in the record that the prosecutor made any attempt to identify and speak to the lawyer for assistance in finding her. Instead, the prosecutor declared he had "no expectation" that she could be found.[12] What the situation demanded, however, was an intensification of efforts, a doubling-down, to search for and locate the witness, even if it required more than an overnight continuance of the trial. In short, this is unlike prior cases, in which we have held that "in the absence of evidence that there was any possibility of locating [the missing witness], no matter how remote, we cannot say that the government failed to meet its good faith effort requirement." *Warren*, 436 A.2d at 831; *cf. Roberts*, 448 U.S. at 74, 100 S.Ct. 2531 ("The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists … 'good faith' demands nothing of the prosecutor."). Here, there appears to have been more than a remote possibility that, with diligent concentrated effort, Harling could and would have been found.

We are mindful that the government can face real challenges in dealing with witnesses who may be unwilling to testify for any number of reasons, some of them understandable and compelling. In some cases, notwithstanding conscientious efforts, the government may not be able to secure a witness's presence at trial. But this is not such a case. The government's efforts were *pro forma* and plainly inadequate in light of Harling's demonstrated reluctance and her importance to the government's case. It is difficult to imagine, in this prosecution dependent on a sole eyewitness, that this lackadaisical approach was "equally as vigorous as that which the government would [have] undertake[n]" to prevent Harling from disappearing had it not had her prior testimony. *Lynch*, 163 U.S.App.D.C. at 18, 499 F.2d at 1023. We can only infer that the government's vigilance had relaxed and only minimal steps were taken to present her live testimony at appellant's second trial once Harling's prior testimony was in hand. *Cf. Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir.1998) (holding no constitutional violation occurred because prosecutor made good faith efforts by subpoenaing the witness, meeting with the witness after the subpoena's issuance, phoning the witness three times as the trial date approached, contacting the witness's parole officer, having a bench warrant issued, and hiring a criminal investigator to locate the witness). Half-measures do not satisfy appellant's rights under the Confrontation Clause or the evidentiary requirement that the witness be "unavailable" before prior recorded testimony may be admitted. *See Idaho v. Wright*, 497 U.S. 805, 835, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("If the State's feeble exertions in this case can be called a good-faith effort to secure [the witness] for trial, the Sixth Amendment protections … would be toothless.").

12. Perhaps the prosecutor felt his options and time were limited. The trial court had made clear when the prosecutor asked for a bench warrant the previous day that delay would not be countenanced. ("I'm not going to be holding this up. I told you all in the beginning, … I [do not] have [a] whole lot of extra time to be wasting with this case. So you got an obligation to subpoena these witnesses. These are not friendly witnesses.")

Thus, we conclude that the trial court abused its discretion in admitting Harling's prior testimony in the second trial because the evidence does not support that the prosecution made reasonable, good faith efforts sufficient to meet its substantial burden of demonstrating that Harling was "unavailable."

### D. *Harmless Error Review*

 This conclusion compels us to apply the constitutional harmless error standard, which requires reversal "unless the government can show that the error was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Duvall v. United States,* 975 A.2d 839, 843 (D.C.2009) (quoting *Fields v. United States,* 952 A.2d 859, 866 (D.C.2008)) ("Under the heightened constitutional standard of review, the government bears the burden of demonstrating that the constitutional error was 'harmless beyond a reasonable doubt,' meaning that the verdict was 'surely unattributable' to the erroneously admitted evidence."). We consider "not what effect the constitutional error might generally be expected to have upon a reasonable [factfinder], but rather what effect it had upon the guilty verdict in the case at hand." *Zanders v. U.S.,* 999 A.2d 149, 156 (D.C.2010) (quotation marks omitted). " '[I]f a statement is improperly admitted, we will reverse where we find a reasonable possibility that the statement contributed to the defendant's conviction.' " (quoting *Callaham v. United States,* 937 A.2d 141, 147 (D.C.2007)).

We have no difficulty concluding that the error was prejudicial in light of the importance of Harling as the sole eyewitness in a prosecution for first-degree murder. The government cannot prove beyond a reasonable doubt that the constitutional error did not contribute to the guilty verdict, as here there is not only a "reasonable possibility" but a certainty that Harling's testimony contributed to appellant's conviction.[13] That would be enough to show prejudice warranting reversal. In this case, in addition, the fact that the first trial resulted in a hung jury and that jury notes from that trial indicate that some jurors "absolutely" did not believe Harling, as well as the trial court's recollection of Harling's tentative testimony and combative nature on the stand, make it clear beyond peradventure that her presence was critical for the jury's assessment of her credibility. As the error was not harmless, we reverse and remand for a new trial.

For the foregoing reasons, the judgment of the trial court is

*Reversed and remanded.*

---

**13.** The government, relying on its contention that appellant forfeited his claim, argues only that appellant cannot show plain error because (1) the error was not "obvious" to the trial court because no prior case in this jurisdiction involved a witness who disappeared during the course of trial, and (2) there was no manifest injustice because the prior testimony was cross-examined in the first trial. The government does not argue that the conviction can be affirmed on harmless error review. The government's decision not to argue for harmless error reflects its prudent recognition that under harmless error review, reversal for prejudice is a foregone conclusion because, as the government has conceded, the case could not have proceeded without Harling's testimony.