Wesley S. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–569.

District of Columbia Court of Appeals.

Argued April 7, 2005.

Decided Aug. 18, 2005.

Dennis M. Hart, Washington, DC, appointed by the court, for appellant.

Jocelyn S. Ballantine, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Elizabeth Trosman, James McGovern, Margaret Chriss, and John C. Einstman, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.

RUIZ, Associate Judge:

Appellant challenges his second conviction arising out of a gun battle in 1990 between two rival drug dealers, during which two teenaged bystanders were shot, one of whom died as a result. His first conviction was reversed and we remanded for a new trial. *See Gordon v. United States,* 783 A.2d 575 (D.C.2001). At the second trial, appellant was convicted of second-degree murder, assault with a deadly weapon, possession of a firearm during a crime of violence, and carrying a pistol without a license. On appeal from his second conviction, appellant complains

that the government's deportation of a witness between the first and second trials and the prosecution's *Brady* violations again warrant reversal and another trial. We disagree, and affirm.

## I.

In March 1990, Kirk "New York" Cheek fought with "Fat Junior" Higgins, an ally of appellant, for control of the open-air drug market on the 700 block of Lamont Street, N.W. Cheek shot Higgins, who survived, though injured. Three days later, on Monday, March 12, 1990, around 2:00 a.m., Cheek was again hanging out on Lamont Street with a group of several local teenagers, including Lamont Simms and his brother, Keith Simms. At that time, a black Honda came driving down Lamont Street toward the group. Government witness Diane Griggs, who was standing outside a nearby house, testified that she called out to the driver of the car using appellant's nickname, "Supa."[1] Appellant brought the car to a stop and spoke with Griggs for a few minutes. In the front passenger seat was the man whom Cheek subsequently identified as the person who had come to Higgins's defense during their skirmish a few days earlier. Another, unidentified man was in the back seat. After leaving Griggs, the Honda crept slowly down the street toward the group. When Cheek heard his nickname, "New York," called from the Honda, he approached the car. He heard his name again, then saw guns extended out of the car windows, one held by appellant. The occupants of the car began shooting at Cheek, in the direction of the group of teenagers. Cheek dove to the ground, got his gun out, and started to return fire toward the back of the Honda as it drove past. He testified that he did not fire into

the group. Cheek survived the gun battle unharmed; Lamont Simms, however, died of a gunshot wound to his heart and lungs, and his brother, Keith, was grazed by a bullet—both apparently bystander victims of drug trafficking-related retaliation against Cheek by appellant and other allies of Higgins. Several witnesses at the scene, including Norman "Soldier" Brown, identified appellant as the driver of the Honda. Brown also testified that he heard Keith Simms, the surviving victim, call out during the shooting, "Supa, Supa, we know it's you. We know it's you." Keith Simms also testified at trial that he recognized appellant as the driver.

Police officers found bullet fragments in the area where the shooting took place. An autopsy of the decedent yielded the lead core of the bullet that killed him. Though the police never recovered any of the guns used by the three assailants in the black Honda, the police did recover the .38 Rossi revolver used by Cheek when they later arrested him for three other unrelated shootings. A forensics expert testified at trial that the bullet fragments from the scene and the lead core recovered from Lamont Simms's body could not have been fired from the .38 Rossi revolver.

The government also presented in its case-in-chief the testimony of several witnesses to forestall the appellant's anticipated alibi—presented during the first trial—that he had been at the Hummingbird nightclub during the time of the shooting. In a surprise twist, the government produced as its last witness Paula Thompson, one of appellant's girlfriends, who had corroborated this alibi at the June 1990 detention hearing prior to the first trial by saying she saw him at the Hummingbird nightclub at the time the shooting was

---

1. One of the teenagers in the group, Antwoin Horton, also testified that he heard the name

"Supa," or "Super," called out shortly before the gunfire.

taking place. She now testified, however, that she had lied at that detention hearing, and that, though she had been at the nightclub the evening of Sunday, March 11, and into Monday morning, appellant had appeared at the nightclub only "towards the end of closing time" on Monday morning, March 12. At that time, she saw him hand a pistol to Andrea "Melody" Williams, appellant's girlfriend, and she heard him tell Williams he had "wasted a boy." On cross-examination, Thompson said she lied at the prior detention hearing on behalf of Williams, who had pressured her to do so because she loved appellant, had a child by him, and did not want to lose him.

Appellant produced five witnesses on his behalf in order to establish his alibi that he had been on a date with Maria Burns at the Hummingbird nightclub when the shooting took place. Also, contrary to Thompson's account, Williams testified that she had not been present at the Hummingbird nightclub on the night of March 11–12, and denied that appellant ever handed her any gun or told her that he had "wasted a kid." Andrew Wise, a former Public Defender Service investigator, testified that as part of his investigation for appellant's post-trial motion for a new trial after his first conviction, he had interviewed government eyewitness Brown. Following the interview, Brown signed a statement saying he had lied at the first trial when he testified that he saw "Supa shoot and that I saw him shooting first."[2] In rebuttal, the government produced the transcript of Brown's 1995 testimony during the hearing on appellant's first motion for a new trial. At that hearing, Brown

affirmed that, though he had not actually seen appellant fire his gun, his prior testimony at the first trial was nevertheless truthful in all other respects.

After the jury returned a verdict of guilty on all charges, appellant filed a motion for a new trial based on undisclosed *Brady* material, which the trial court denied after a hearing. The trial court resentenced appellant to the same sentence he received after his first trial, an aggregate of eighteen years to life. Appellant then timely noted this appeal.

## II.

Appellant claims that the trial court erred: (1) by denying his motion for a new trial based on newly-discovered impeachment witnesses that the government had withheld from him; (2) by admitting Brown's prior testimony from the first trial even though he was unavailable for cross-examination at the second trial because he had been deported; (3) by admitting the government's ballistics evidence after it had destroyed Cheek's revolver; and (4) by denying his motion for judgment of acquittal due to the insufficiency of the government's evidence. We conclude that none of appellant's assignments of error has merit.

### 1. The alleged Brady violation

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

**2.** The PDS investigator also interviewed Cheek after the first trial, following which Cheek signed a statement claiming that he had given untruthful testimony against appellant at the first trial in order to get a better deal from the government in other unrelated cases against him, and wanted to set the record straight. Notwithstanding that momentary recantation, Cheek's testimony at the second trial was consistent with his testimony at the first.

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "[T]he burden is on the defendant to prove materiality—hence prejudice—in the *Brady* sense." *Bennett v. United States,* 763 A.2d 1117, 1125 n. 9 (D.C.2000) (citations omitted). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Within six days of the verdict in the second trial, appellant filed a motion for a new trial claiming that the government violated its *Brady* obligation to disclose exculpatory information: two witnesses who could have undermined the credibility of government witness Paula Thompson, who testified that she saw the appellant come into the nightclub when it was about to close in the early morning hours of Monday, March 12 (*i.e.,* after the. shooting), and hand a gun to his girlfriend, Melody Williams, confessing to her that he had "wasted a boy." [3]

During her testimony, Thompson also mentioned that she thought two other people, Joan McKenzie and Constance Grant, were in the Hummingbird nightclub as well when the appellant arrived. Appellant's post-trial *Brady* motion included the affidavits of McKenzie and Grant to the effect that they had told the prosecutor prior to trial that they had not been at the club, and that they would have so testified had they been called as witnesses. The prosecutor's affidavit submitted with the government's opposition to the new trial motion represented that the witnesses, Grant and McKenzie, had told the prosecutor prior to trial that they could not remember whether they had been at the Hummingbird nightclub on the night in question. After hearing argument from counsel, but not the live testimony of the affiants, the trial court denied appellant's motion, finding that the prosecutor offered the more credible evidence on the issue of what the proffered witnesses had said, that the government had not suppressed the identity of the potentially impeaching witnesses, and that, in any event, their testimony would have been merely cumulative. Although we disagree that the trial court could resolve a conflict in the affidavits presented by appellant and the government without holding an evidentiary hearing, we conclude there was no *Brady* violation.

As the trial court noted, Thompson referred to McKenzie and Grant during her testimony at the end of the government's case-in-chief. [4] Consequently, the trial

---

**3.** Appellant also claims that the government improperly failed to disclose before the second trial that Thompson, who had supported appellant's alibi at the pretrial detention hearing before his first trial, would directly inculpate him during the second trial. This "surprise" testimony, appellant claims, violated his due process rights. Appellant, however, had no right to be notified of the government's witnesses before trial. *See* Super. Ct.

Crim. R. 16(a); *Rambert v. United States,* 602 A.2d 1117, 1120 (D.C.1992) ("[T]he government was under no duty to disclose the names of its witnesses before trial."). Appellant exercised his right to impeach Thompson with the contrary testimony she had given earlier.

**4.** At oral argument the government represented to the court that Thompson had testified about Grant's presence at the nightclub dur-

court did not err in finding that the government had not suppressed information, at least about the existence of these potentially exculpatory witnesses. *See Catlett v. United States,* 545 A.2d 1202, 1217 (D.C. 1988) (holding no *Brady* suppression where appellant became aware of potentially exculpating witness during the course of testimony in the government's case-in-chief).

The trial court also found that the witnesses were not material as they would have presented cumulative evidence and could only have impeached Thompson regarding her "uncertain" statement that she thought they were present at the Hummingbird nightclub. Appellant argues, however, that their testimony would have rebutted Thompson's assertion that she had seen Grant and McKenzie at the club, and raised a question about her report of having also seen appellant at the club—with his incriminating act and words. Our review of the record reveals that Thompson testified at trial that she was certain that Grant was at the nightclub, but that she was "not quite sure" whether McKenzie had been present. Consequently, Grant could have offered direct impeachment by testifying that, contrary to what Thompson said, she (Grant) was not at the nightclub. The trial court noted that the proffered testimony would have been the same as that offered by Melody Williams, who—also contrary to

Thompson's trial testimony—testified that she was not at the nightclub the night of the shooting and did not even know Thompson. *See United States v. Cuffie,* 317 U.S.App. D.C. 38, 42, 80 F.3d 514, 518 (1996) (citations omitted) ("[U]ndisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence."). We recognize, however, that Williams was herself impeached for bias resulting from her relationship with appellant in a manner that Grant would not have been. Therefore, Grant's testimony was not immaterial because it was "merely cumulative" of Williams's testimony.

The relative unimportance of these witnesses, however, is reflected in the actions of defense counsel, who never requested a continuance in order to investigate their potentially exculpatory testimony after Thompson referred to them during the trial. *See Frezzell v. United States,* 380 A.2d 1382, 1385 (D.C.1977), *cert. denied,* 439 U.S. 931, 99 S.Ct. 319, 58 L.Ed.2d 324 (1978). Appellant vigorously cross-examined Thompson, and had more effective impeachment confronting her with her prior inconsistent statement made at the pretrial detention hearing that appellant had been at the nightclub during the time the shooting occurred.[5] Thompson admitted that she had lied at the detention hearing, explaining that she had done so for Melody

ing the pretrial detention hearing in 1990, and that defense counsel therefore had known of Grant's existence since before the first trial.

**5.** Appellant claims that the trial court prevented him from fully cross-examining Thompson because he was warned that if he questioned Thompson regarding why she had given contrary testimony at the detention hearing, he would effectively open the door allowing the government to bring in evidence from Thompson showing that appellant himself had intimidated her into doing so. He

claims that the trial court threatened to commit the same error that resulted in reversal of the conviction following the first trial, namely, admission of unduly prejudicial evidence of witness intimidation. *See Gordon,* 783 A.2d at 587. The government, however, never introduced such evidence at the second trial, rehabilitating Thompson instead by eliciting her testimony that she lied at the earlier detention hearing for the sake of Melody Williams, who was emotionally involved with appellant.

Williams's sake. As a result, at appellant's request, the trial court gave a perjurer's instruction regarding Thompson's testimony. On this record, appellant has not shown that the testimony of McKenzie and Grant would have been material, *i.e.*, that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375.[6]

### 2. Admission of the prior testimony of Norman Brown after his deportation

Appellant complains that the trial court abused its discretion when it permitted the government to introduce Norman Brown's testimony from the first trial during the government's case in the second trial on the ground that Brown was unavailable. He argues that the government should not have been permitted to satisfy its burden of showing Brown's unavailability when it was the government itself that caused Brown to be unavailable by deporting him prior to the second trial. This court reviews for abuse of discretion the admission of a witness's prior recorded testimony due to the witness's present unavailability. *See Skyers v. United States*, 619 A.2d 931, 934 (D.C.1993); *Jones v. United States*, 441 A.2d 1004, 1007 (D.C.1982).

An exception to the hearsay rule permits the admission of prior cross-examined testimony if the declarant is unavailable. *See Harris v. United States*, 614 A.2d 1277, 1284 (D.C.1992) (citing FED. R. EVID. 804(b)(1)). Where the defendant has been afforded an opportunity to cross-examine a non-citizen witness during a prior proceeding, there is no Confrontation Clause violation when the witness's testimony is admitted at a later proceeding after the witness has been repatriated and is no longer available to testify. *See United States v. Terrazas–Montano*, 747 F.2d 467, 469 (8th Cir.1984) (holding that although the government did not make any effort to detain the alien witnesses and in fact actively repatriated them prior to trial, admission of their prior testimony after they became unavailable for trial did not violate the Confrontation Clause because the defendant had prior opportunity to cross-examine the witnesses in a "trial-type" setting; *see also Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Testimonial statements of witnesses absent from trial have been admitted ... where the declarant is unavailable, and ... where the defendant has had a prior opportunity to cross-examine.").

Appellant argues, however, that the government has a good faith obligation to ensure that its witnesses are not forcibly removed from the United States until all appeals in a case are exhausted, because of the possibility of retrial. He cites no support for that proposition, and we have found no authority imposing on the government so sweeping a responsibility. Appellant does not argue that Brown's deportation was conducted in bad faith, or for the purpose of making Brown unavailable at appellant's second trial; nor does appellant contend that Brown's deportation impeded the presentation of important, new testimony.

At the hearing on appellant's pre-trial motion to dismiss because of Brown's unavailability, the government represented, without contradiction, that it had only

---

6. Even analyzing appellant's argument as a claim for a new trial based on newly-discovered evidence, appellant's proffered evidence fails to warrant a new trial because, at best, it is cumulative and impeaching, and not of such a nature as to likely result in acquittal. *See Arrington v. United States*, 804 A.2d 1068, 1076 n. 13 (D.C.2002) (citations omitted).

found out about Brown's deportation a few weeks before trial, that it searched for him for some time through its system, that it in fact found a Norman Brown, but determined he was not the witness in this case, and finally concluded that witness Brown was no longer within the subpoena power of the United States. The government also met the remaining prerequisite for admission of prior recorded testimony: appellant had the opportunity to cross-examine Brown at his first trial; he later was able to obtain a partial recantation from Brown, which was admitted at his second trial; he was also able to cross-examine Brown after the first trial, at the 1995 hearing on appellant's motion for a new trial, when Brown sought to narrow the scope of his recantation. *See Skyers,* 619 A.2d at 933–34 (noting that party against whom prior testimony is offered must have had the opportunity to cross-examine the declarant at the former proceeding). On this record we perceive no abuse of discretion in the trial court's admission of Brown's prior cross-examined testimony due to his unavailability, and in the denial of appellant's motion to dismiss. *See United States v. Wilson,* 36 F.Supp.2d 1177, 1181 (N.D.Cal.1999) (noting that courts have admitted prior testimony of alien witnesses where "the government took affirmative steps to preserve the testimony of witnesses for use in a criminal proceeding before they left the country").

### 3. The missing gun

■ Appellant complains that he was denied a fair trial by the trial court's refusal to sanction the government for destroying the .38 Rossi revolver used at the shooting by his drug rival (turned government witness) Cheek. Two years after the first trial in this case, the government, for reasons unknown, destroyed Cheek's revolver following trials against Cheek in other unrelated cases. Appellant now challenges the trial court's refusal to exclude the ballistics evidence related to the gun as a sanction against the government.[7]

■ Where the government has failed to preserve evidence, "[t]he factors to be considered in determining whether sanctions should be applied are [1] the degree of negligence or bad faith involved, [2] the importance of the evidence lost, and [3] the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." *Cotton v. United States,* 388 A.2d 865, 869 (D.C.1978) (internal quotations omitted). "Absent an abuse of discretion, the decision of what sanctions, if any, to impose is committed to the trial court." *Id.* (citations omitted).[8]

Appellant has shown some negligence on the part of the government in failing to preserve Cheek's .38 Rossi. That negligence, however, caused minimal, if any, prejudice to appellant, because the govern-

---

7. Upon learning of the gun's destruction during pretrial preparation, appellant filed a motion to dismiss the charges. Though it found the loss of evidence regrettable, the trial court denied appellant's motion to dismiss. Appellant filed an interlocutory appeal of the denial of that motion, which this court dismissed for lack of jurisdiction. *See Williams v. United States,* 02–CO–1217 (D.C. Nov. 8, 2002).

8. Where the exculpatory effect of the evidence is unknown, the destruction of evidence by the government violates a defendant's due process rights only when the government act-

ed in bad faith, leading to an inference that the evidence was potentially exculpatory. *See Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Appellant has shown, at most, that the government was negligent, and, as we discuss, has not demonstrated how the .38 Rossi would have been exculpatory. It is insufficient merely to allege that the missing evidence "might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58, 109 S.Ct. 333.

ment preserved the bullet core recovered from the decedent's body and the bullet fragments recovered from the scene. At the pretrial hearing on this issue, appellant made clear that the bullet core and the recovered fragments were available to him prior to the second trial, and were examined by his own ballistics expert. Appellant's defense theory was that the shots that killed Lamont Simms and injured Keith Simms were fired by Cheek, not appellant. To support that theory, appellant represented at the pre-trial hearing that his ballistics expert had determined that the bullet core recovered from the decedent's body "could have been fired from any weapon," *i.e.*, including Cheek's .38 Rossi. Since Cheek's revolver would not have been necessary to prove this point, the loss of the revolver would not have been significant, and, in fact, was arguably helpful to appellant, since he no longer had to prove that the bullet fragments could have been fired from Cheek's particular gun.

The government's ballistics expert testified at the first and the second trials that the bullet fragments and the lead core had been fired from a weapon with "five lands and grooves [with a] right twist," while a .38 Rossi has six "lands and grooves . . . to the right." Appellant, however, did not have his promised expert testify at trial to rebut the government's expert. The government's unrebutted expert testimony was therefore that the bullet that killed the decedent could not have been fired from Cheek's .38 Rossi. As we discuss in the next section, the government's case against appellant was strong, even aside from the ballistics evidence. Since the prejudice to appellant resulting from the destruction of Cheek's gun was so slight in light of the strength of the government's case, the trial court did not abuse its discretion in deciding not to sanction the gov-

ernment and in admitting the government's ballistics evidence.

### 4. The denial of the motion for judgment of acquittal

Finally, appellant claims that the trial court erred in denying his motions for judgment of acquittal because "the contradictory and circumstantial evidence" adduced by the government at trial did not provide a sufficient basis on which a reasonable jury could conclude that appellant was present at the shooting, and had the specific intent to kill Lamont Simms, and the general intent to injure Keith Simms.

■■■■■ As appellant acknowledges, "[i]n considering a claim of insufficient evidence, this court 'must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *Gathy v. United States*, 754 A.2d 912, 917 (D.C.2000) (internal quotations omitted). Second-degree murder is a specific intent crime, *see Bates v. United States*, 834 A.2d 85, 93 (D.C.2003), while assault with a dangerous weapon is a general intent crime. *See Gathy*, 754 A.2d at 919. Appellant was charged as a principal and also as an aider and abettor. "[T]he essential elements of aiding and abetting are: (1) that an offense was committed by someone; (2) that the accused participated in the commission; and (3) that he did so with guilty knowledge." *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984) (citation omitted).

■■■■■ In its case-in-chief, the government adduced evidence from several eyewitnesses that appellant drove the black Honda to the scene of the shootings, and that he and the other occupants of the Honda called out to Cheek, pointed their

guns in the direction of the group where Cheek was, and fired. Later that night, Thompson saw appellant at the Hummingbird nightclub, where he handed a revolver to Melody Williams, and heard him tell her that he had "wasted a boy." Any "contradictions among witnesses at trial ... [were] matters for the jury to resolve as they weigh[ed] all the evidence." *Payne v. United States,* 516 A.2d 484, 495 (D.C. 1986) (citation omitted). Whether or not appellant actually fired a gun at the group, there was sufficient evidence from which a reasonable jury could find that appellant drove the Honda and its passengers looking for Cheek in order to shoot him, and that the shots were purposely aimed at the group of which Cheek was a part. A reasonable jury could, therefore, conclude beyond a reasonable doubt that appellant had the specific intent to kill Cheek and the general intent to commit assault with a dangerous weapon, and that he aided and abetted others in the shooting. That the Simms brothers were hit instead of Cheek does not negative the requisite element of intent. "[I]t is every man's business to foresee what wrong or mischief may happen from that which he does with an ill-intention, and it shall be no excuse for him to say that he intended to kill another, and not the person killed." *O'Connor v. United States,* 399 A.2d 21, 24 (D.C.1979) (affirming the law of transferred intent in the District of Columbia) (quoting *Gladden v. State,* 273 Md. 383, 330 A.2d 176, 180–81 (1974) (quoting *Reg. v. Saunders,* 2 Plowd. 473, 75 Eng. Rep. 706 (1576))). The trial court did not err, therefore, in denying appellant's motions for acquittal.

For the foregoing reasons, the judgment of conviction is

*Affirmed.*