*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CF-870 & 19-CF-675

DERRYCK ANTJUAN DECUIR, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-8347-15)

(Hon. Hiram Puig-Lugo & Hon. Craig Iscoe, Trial Judges)

(Argued June 16, 2022                    Decided November 23, 2022)

*Jennifer Williams*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Ethan L. Carroll*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Jeffrey S. Nestler*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, MCLEESE, and ALIKHAN, *Associate Judges*.

ALIKHAN, *Associate Judge*: Derryck Decuir was convicted on various charges stemming from the June 2015 shooting of Malek Mercer.  On appeal, he raises several claims of error.  For the reasons explained, we reverse Mr. Decuir's convictions for second-degree murder and possession of a firearm during a crime of

violence due to the erroneous admission of witness testimony from an earlier trial. We affirm the appellant's remaining convictions.

## I.     Factual Background and Procedural History

After 11:30pm on June 15, 2015, Malek Mercer walked to a bus stop on 28th Street, SE, with his friend Tysean Bethea and Mr. Bethea's girlfriend, Amani Jenifer. Mr. Mercer was carrying a black duffel bag that may have contained a shotgun. The trio took the bus to the corner of Minnesota and Pennsylvania Avenues, SE, at which point Ms. Jenifer left to transfer to another bus, and Mr. Mercer and Mr. Bethea crossed the street to wait for the bus to go back to Mr. Bethea's house.

Mr. Decuir was also waiting at the bus stop with his friends, including Aaron McCaskill and Anthony Ryans. Mr. Decuir, who was armed with a Ruger 9mm handgun, made a comment about Mr. Mercer's belt, at which point Mr. Ryans said, "[w]hy you looking at that boy's butt?" The bus arrived, and everyone boarded. After a short ride, both groups of men got off the bus at 28th Street and Naylor Road, SE. Mr. Mercer and Mr. Bethea exited first, with Mr. Decuir, Mr. Ryans, and Mr. McCaskill behind them. At trial, Mr. Bethea testified that after everyone had exited the bus, he and Mr. Mercer turned around and saw Mr. Decuir coming toward them and pointing a gun. Mr. Decuir fired a single shot and hit Mr. Mercer. Mr. Mercer succumbed to his injuries three days later.

Mr. Decuir was arrested after he was identified from the bus security footage. From jail, he called his girlfriend, Ashley Graves, and told her to remove various items—"dogs," a "Stephen Curry jersey," and "toenail shells"—from his backyard. Ms. Graves understood that these terms were code words for firearms and ammunition. Mr. Decuir also told her to relay these instructions, along with the code to his safe, to his friend, Waverly Schuler. Mr. Schuler subsequently hid the firearms in the woods near Mr. Decuir's house. Mr. Decuir also told Ms. Graves, over at least four separate calls from jail, to instruct Mr. McCaskill to tell the "truth" and to "tell him [not to] lie." The truth, he told her, was that he had gotten off the bus to urinate and then heard a shot and saw someone running. When Ms. Graves reported that Mr. McCaskill had been confused by the "truth," Mr. Decuir responded that he didn't want to get "no f*ing charge for obstruction of justice, you know what I'm saying?" He conveyed the same sentiment on a subsequent three-way call between himself, Mr. McCaskill, and Ms. Graves.

Mr. Decuir was charged with First Degree Murder While Armed (Premeditated) Committed Against a Minor, in violation of D.C. Code §§ 22-2101, -4502, -3611; three counts of Possession of a Firearm During a Crime of Violence ("PFCV"), in violation of D.C. Code § 22-4504(b); one count of Attempt to Commit Robbery While Armed Committed Against a Minor, in violation of D.C. Code §§ 22-2801, -2802, -4502, -3611; one count of First Degree Murder While Armed -

Felony Murder Committed Against a Minor, in violation of D.C. Code §§ 22-2101, -4502, -3611; one count of Unlawful Possession of a Firearm (Prior Conviction), in violation of D.C. Code § 22-4503(a)(1); one count of Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of D.C. Code § 22-4504(a)(2); one count of Obstructing Justice (Due Administration of Justice), in violation of D.C. Code § 22-722(a)(6); and one count of Tampering with Physical Evidence, in violation of D.C. Code § 22-723.

The government tried Mr. Decuir three times. At the first trial, which took place before the Honorable Hiram Puig-Lugo in early 2017, the government proceeded on the theory that Mr. Decuir had shot Mr. Mercer as part of a botched robbery, and it presented evidence that Mr. Decuir had targeted Mr. Mercer because of his expensive belt. The jury found Mr. Decuir guilty on the charges of obstructing justice, evidence tampering, felon-in-possession, and carrying a pistol without a license, but acquitted him on the charges of first-degree murder, attempted robbery, and the attendant PFCV charges. Despite extended deliberations, the jury was unable to reach a verdict on the lesser-included offense of second-degree murder and the associated PFCV charge, and the court declared a mistrial on those counts.

In early 2018, the government tried Mr. Decuir a second time on the second-degree murder and PFCV charges, this time before the Honorable Craig Iscoe. The

government's theory this time was that Mr. Decuir had been angry at Mr. Mercer for something unspecified, or that he had wanted to take Mr. Mercer's bag or belt. The jury again could not agree on a verdict, and Judge Iscoe declared a mistrial.

After the second trial, the government moved to proceed to sentencing before Judge Puig-Lugo on the counts on which Mr. Decuir had been convicted at the first trial. Over Mr. Decuir's objection, the trial court granted the motion. In August 2018, the court sentenced Mr. Decuir to an 8-year term of incarceration, a 3-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the felon-in-possession count, to run concurrently with a 28-month term of incarceration, a 3-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the count of carrying a pistol without a license. The court also sentenced him to a consecutive 15-year term of incarceration, a 5-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the obstruction count, to run concurrently with a 16-month term of incarceration, a 5-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the tampering count.

Mr. Decuir's third and final trial for second-degree murder and the associated PFCV charge happened in spring 2019 before Judge Iscoe. The government's theory

at this trial was that Mr. Decuir had interpreted Mr. Ryans's question, "[w]hy you looking at that boy's butt?" as implying that Mr. Decuir was attracted to Mr. Mercer. In an effort to prove his heterosexuality, the prosecution argued, Mr. Decuir had shot Mr. Mercer. Mr. Ryans's testimony was critical to this new theory of the case, but the government contended that he was unavailable and sought permission to introduce his testimony from the second trial. Over Mr. Decuir's objection, the trial court found that Mr. Ryans was unavailable and admitted his earlier testimony.

The jury found Mr. Decuir guilty of second-degree murder and the associated PFCV charge. In July 2019, the court sentenced Mr. Decuir to a 34-year term of incarceration (with a 5-year mandatory minimum), a 5-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the second-degree murder count; and an 8-year term of incarceration (with a 5-year mandatory minimum), a 3-year term of supervised release, and a $100 payment to the Victim of Violent Crime Compensation Fund on the PFCV count. The court ordered that the sentences of incarceration run concurrently with each other and concurrently with Mr. Decuir's sentences of incarceration on the earlier counts. This appeal followed.

## II.    Discussion

Mr. Decuir raises several issues on appeal, challenging his obstruction conviction; the trial court's decision to proceed to sentencing on the initial counts of conviction after the second trial; and several aspects of his third trial, including the admission of Mr. Ryans's testimony from the second trial.  Taking these in reverse order, we agree that the trial court erred in finding Mr. Ryans unavailable and allowing his previous testimony to come in as evidence during the third trial, and we thus reverse and remand for further proceedings on the second-degree murder and associated PFCV count.  But we discern no abuse of discretion in the trial court's decision to proceed to sentencing after the second trial and no defect in Mr. Decuir's obstruction conviction, and we therefore do not disturb his remaining convictions and sentence.

### A.    Admission of Anthony Ryans's Prior Testimony

We begin our review with Mr. Decuir's argument that the trial court erred in finding that Mr. Ryans was unavailable to testify at the third trial and by admitting his testimony from Mr. Decuir's second trial.  We agree that the testimony was

incorrectly admitted and that the error was not harmless. Accordingly, we reverse and remand for further proceedings on the second-degree murder and PFCV counts.[1]

### 1. The government's efforts to locate Mr. Ryans

A week before the third trial was set to begin, the government requested a continuance because, in part, it needed more time to secure witnesses who had been difficult to reach during the first two trials, including witnesses who no longer lived in the area. Defense counsel opposed a continuance, noting that the prosecution had had over a year since the second trial to locate and contact witnesses. The court pushed the trial date back one week.

Three days before the new trial date, the government filed a motion to admit the transcript of Mr. Ryans's testimony from Mr. Decuir's second trial, asserting that Mr. Ryans was unavailable to testify at the third trial despite the government's attempts to locate him. The government explained that, during the first trial, Mr. Ryans had been detained in Virginia, so he was able to appear at the trial on a day writ. Before the second trial, the government learned that Mr. Ryans had an open

---

[1] Because we are reversing the verdict in the third trial, we need not address Mr. Decuir's other challenges to how that trial was conducted, including his arguments that (1) voir dire was improperly conducted; (2) a detective's testimony regarding knowledge of self-defense law was incorrectly excluded; and (3) the government's opening statement from the first trial concerning Mercer's possession of a shotgun was incorrectly excluded.

warrant and enlisted the U.S. Marshals Service to locate him. He was found in South Carolina, brought back to Virginia, and again appeared on a day writ. By the time of the third trial, Mr. Ryans was out on probation, but he had failed to report his location to his probation officer as required, hindering the government's efforts to locate him. The government had contacted the prosecutor and defense counsel in Mr. Ryans's probation case, but neither had his current address. The government also reported that it had run Mr. Ryans's name through various government databases and contacted individuals affiliated with him, including Stephanie Parrish, the mother of his children; and Lesley Lyttle, a woman with whom he had previously lived and worked, but to no avail.

Defense counsel opposed the motion, arguing that the government had not made sufficient efforts to locate Mr. Ryans. Specifically, the government had not explained when it had started looking for Mr. Ryans or whether the U.S. Marshals Service had visited any of his known addresses in an attempt to find him instead of merely placing phone calls.

The trial court expressed its inclination to grant the government's motion and declare Mr. Ryans unavailable if continued efforts to locate him proved fruitless. The court explained that it was satisfied with the government's efforts so far, and it issued a material-witness warrant to aid the government in finding him.

When the court and the parties returned to the issue several days later—after the third trial had begun—defense counsel requested that the government present live testimony concerning its efforts to locate Mr. Ryans rather than proceeding on a proffer. The affidavits submitted in response indicated that the government had not begun looking for Mr. Ryans until seven days before trial, and it had not retained the U.S. Marshals Service to look for him until after the day trial began, which was after the judge had ordered the government to continue looking for him. After the trial began, the Deputy United States Marshal assigned to handle the material-witness warrant conducted daily online searches, spoke with police officers in South Carolina who had had previous interactions with Mr. Ryans, spoke with other Deputy Marshals who had previously arrested Mr. Ryans, and attempted to make contact with several people whom he believed had information concerning Mr. Ryans's whereabouts.

After receiving the affidavits, the trial court held a hearing and determined that Mr. Ryans was unavailable. The court noted that Mr. Ryans was "plainly hiding from law enforcement for reasons independent of this trial." Despite the court's concern that the government had not made serious efforts to find Mr. Ryans until after trial had begun, the court found no indication that "earlier efforts would likely have been more successful." Subsequently, at the relevant point in the trial, the court

played the audio and admitted the transcript of Mr. Ryans's testimony from the previous trial.

## 2. Legal analysis

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. U.S. Const. amend. VI. The Confrontation Clause prohibits the introduction of prior testimonial statements against a defendant unless "the defendant has had (or has forfeited) the opportunity to be confronted with the witness who made the statement, and [] the witness is unavailable to testify at trial." *Brooks v. United States*, 39 A.3d 873, 882 (D.C. 2012). If the government wants to admit prior recorded testimony, it must be able to demonstrate that the declarant is unavailable to testify at trial; that the testimony was given under oath at a prior legal proceeding; that the issues in both proceedings are essentially the same; and that the defense had the opportunity to cross-examine the declarant at the prior proceeding. *Id.* "Thus, as a matter of constitutional and evidentiary law, 'unavailability' of the witness is 'a necessary precondition' to the introduction of prior testimony." *Id.* (quoting *United States v. Lynch*, 499 F.2d 1011, 1023 (D.C. Cir. 1974)).

We review the trial court's determination that Mr. Ryans was unavailable— and its subsequent admission of his prior testimony—for abuse of discretion.

*Williams v. United States*, 881 A.2d 557, 564 (D.C. 2005). As the party seeking to introduce Mr. Ryans's previous testimony, the government bears the burden of establishing that he was unavailable to testify at the third trial. *Brooks*, 39 A.3d at 883. That burden is "substantial." *Stack v. United States*, 519 A.2d 147, 156 (D.C. 1986). To establish unavailability, the government must make a "'reasonable, good faith effort' to secure the witness's presence at trial." *Brooks*, 39 A.3d at 883 (quoting *Williams*, 881 A.2d at 564). Whether the government has made a "reasonable" effort is determined on a "context-and-fact-specific" basis. *Id.* In the case where the government is seeking to admit testimony from a previous trial, it must be able to show that it conducted a "*search equally as vigorous* as that which the government would undertake to find a critical witness if it has no [prior] testimony to rely upon in the event of 'unavailability.'" *Id.* (alteration in original) (quoting *Lynch*, 499 F.2d at 1023).

In conducting the above inquiry, we must consider the importance of the witness who is purportedly "unavailable." *See United States v. Foster*, 986 F.2d 541, 543 (D.C. Cir. 1993) ("The more important the witness to the government's case, the more important the defendant's right . . . ."); *Lynch*, 499 F.2d at 1022-23 (noting that "policies underlying the general prohibition of hearsay" are "especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant"). Mr. Ryans was undoubtedly a critical government witness. He is

Mr. Decuir's cousin and friend, was present on the night in question, and was called to testify in the first two trials. His testimony was even more important at the third trial considering the government's new theory that Mr. Decuir shot Mr. Mercer to defend his sexuality after Mr. Ryans had asked him "[w]hy are you looking at that boy's butt?" In this vein, the government expressed concern about starting the trial without knowing whether it would have Mr. Ryans's testimony. Additionally, as a witness in the second trial, Mr. Ryans cried on at least one occasion—demeanor a jury certainly would need to consider. *Brooks*, 39 A.3d at 884-85 ("It is axiomatic that '[d]emeanor is of the utmost importance in the determination of credibility of a witness.'" (alteration in original) (quoting *Gov't of the V.I. v. Aquino*, 378 F.2d 540, 548 (3d Cir. 1967))); *In re Temple*, 629 A.2d 1203, 1208-09 (D.C. 1993) ("The factfinder who hears the evidence and sees the witnesses is in a better position to make [credibility] determinations, having the benefit of those critical first-hand observations of the witness[es]' demeanor or manner of testifying which are so important to assessing credibility."). Mr. Ryans's testimony was unquestionably central to the government's case, and he had proven in earlier trials to be a witness whose demeanor was of potential importance.

We must also consider the seriousness of the crimes and the severity of the punishment, because that heightens the bar for "deciding whether the government's efforts were sufficient." *Brooks*, 39 A.3d at 884. While "[t]here is no 'bright line'

rule" that a witness cannot be deemed unavailable in a murder trial, the "seriousness of the charged crime" is a substantial consideration in assessing the prosecution's efforts to locate a witness. *Id.* (citing *United States v. Pizarro*, 717 F.2d 336, 351 (7th Cir. 1983)). Mr. Decuir was found guilty of second-degree murder (as well as a related weapons offense) based on the testimony of a missing witness, and he received a combined 42-year term of incarceration for these two offenses. Where, as here, "the consequences of a conviction based on the absent witness'[s] testimony are grave," we must be especially mindful of Confrontation Clause concerns. *Id.* (quoting *McCandless v. Vaughn*, 172 F.3d 255, 266 (3d Cir. 1999)).

Applying the above principles, we conclude that the government failed to meet its substantial burden to conduct a "search equally as vigorous" as it would have in the absence of prior testimony. *Id.* at 883 (emphasis omitted) (quoting *Lynch*, 499 F.2d at 1023). Because this case involved multiple trials, we can compare the government's efforts to locate Mr. Ryans for the third trial against its (successful) efforts in the earlier trials. Before the second trial, the government enlisted the U.S. Marshals Service in searching for Mr. Ryans after discovering an open warrant in Virginia. He was found in South Carolina, arrested, and brought to Virginia, where he was able to testify at trial on a day writ. Based on its efforts to locate him for the second trial, the government was on notice that Mr. Ryans was a reluctant witness and that it might need the U.S. Marshals Service to retrieve him

for the third trial. Yet the government did not begin looking for Mr. Ryans until seven days before the third trial began, and it did not involve the U.S. Marshals Service until after the first day of trial. Additionally, although the government knew that Mr. Ryans had ties to South Carolina based on its efforts to locate him during the second trial, it did not look for him there before moving to have his previous trial testimony admitted. And while the government deserves some credit for trying to find Mr. Ryans after the third trial began, *see supra* at 9-10, these efforts were largely undertaken after the court ordered the government to keep looking for him, and they do not excuse a lack of "good-faith efforts undertaken prior to trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Considering the centrality of Mr. Ryans's testimony to the government's case and the weight of the charges, the government's efforts to locate Mr. Ryans for the third trial fell short of what was required for the trial court to deem him unavailable, and the court acted outside the scope of its discretion in concluding otherwise.

### 3. Harmless error review

Given our conclusion that the trial court abused its discretion by admitting Mr. Ryans's prior testimony, we must reverse unless the government can show that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see Wynn v. United States*, 241 A.3d 277, 283 (D.C. 2020)

("[W]e must determine whether there is a reasonable possibility that the error might have contributed to the conviction." (internal quotation marks omitted)). When faced with erroneously admitted testimony, "we will reverse where we find a reasonable possibility that the statement contributed to the defendant's conviction." *Brooks*, 29 A.3d at 889 (quoting *Callaham v. United States*, 937 A.2d 141, 147 (D.C. 2007)).

We conclude that the error was not harmless. The verdict on the second-degree murder charge was clearly a difficult one to reach, as evidenced by the fact that two juries had previously failed to come to a decision. At the third trial, the government proceeded on the theory that Mr. Decuir had shot Mr. Mercer in response to Mr. Ryans's insinuation that Mr. Decuir was interested in the young man. The government's new theory made Mr. Ryans's account of the events—and the jury's impression of him—critical. Given the centrality of Mr. Ryans's testimony to the government's case, the government cannot prove beyond a reasonable doubt that the Confrontation Clause error did not contribute to Mr. Decuir's convictions. We thus reverse and remand for further proceedings on the second-degree murder charge and the related PFCV count.

## B.     Obstruction of Justice

We next turn to Mr. Decuir's challenge to his conviction for obstruction of justice.   Under D.C. Code § 22-722(a)(6), "[a] person commits the offense of obstruction of justice if that person . . . [c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding."   The term "corruptly" indicates an "intent to undermine the integrity of [a] pending investigation."  *Smith v. United States*, 68 A.3d 729, 742 (D.C. 2013); *see Hawkins v. United States*, 119 A.3d 687, 701 (D.C. 2015) (discussing that several federal appellate courts define "corruptly" as "act[ing] 'knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice'" (first citing *United States v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007); and then citing *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013))).   An "official proceeding" is defined in Section 22-721(4) as "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding."

The government charged Mr. Decuir with obstruction of justice on the basis that he called his girlfriend, Ms. Graves, from jail and, using coded language, told her to tell Mr. Schuler to move his firearms to prevent law enforcement from finding them.  At trial, the jury was instructed that the elements of the obstruction offense

were "1. [Mr.] Decuir endeavored to obstruct or impede the due administration of a pending criminal case in the Superior Court of the District of Columbia; and 2. [Mr.] Decuir did so with the intent to undermine the integrity of the pending criminal case." Mr. Decuir argues on appeal that this conviction cannot stand because Section 22-722(a)(6) does not apply to the concealment of physical evidence.

Although this question has previously come before this court, we have not yet needed to address it. *See Wynn v. United States*, 48 A.3d 181, 191 n.15 (D.C. 2012). We similarly need not address it here. That is because, even if we were to adopt Mr. Decuir's contention that Section 22-722(a)(6) applies only in "situations where defendants have corruptly or violently influenced *people*," that is exactly what happened here. The evidence showed that Mr. Decuir corruptly—that is, with the "intent to undermine the integrity of [a] pending investigation," *Smith*, 68 A.3d at 742—communicated with another person to prevent law enforcement from locating firearms during their investigation of Mr. Malek's murder. Specifically, he "influenced" one person, Ms. Graves, to tell another person, Mr. Schuler, to take steps to impede the police's investigation and pending criminal charges against him. And he did so with the requisite corrupt intent. All of the actions leading to his obstruction conviction involved communications with other people, and there is no limitation—under either the government's or Mr. Decuir's interpretations—that these obstructive communications cannot somehow *concern* physical evidence.

Accordingly, we conclude that Mr. Decuir's conduct came within the meaning of the statute and uphold the obstruction of justice conviction.

### C.    Sentencing

Finally, we turn to Mr. Decuir's challenge to the trial court's decision to proceed to sentencing for his convictions from the first trial before the third trial, in which he was being retried for second-degree murder and PFCV, had concluded. After the first trial in March 2017, the jury found Mr. Decuir guilty of obstruction of justice, tampering with evidence, felon-in-possession of a firearm, and carrying a pistol without a license.  In April 2018, after the second trial had resulted in a mistrial on the second-degree murder and PFCV charges, the government requested that Judge Puig-Lugo proceed to sentencing on the convictions from the first trial.  It argued that due to the "length of time that [had] already elapsed, the length of time that [would] elapse (given that the third trial [would] take place sometime in 2019), and the fact that a judge other than Judge Puig-Lugo [would] be presiding over the third trial," the "interests of justice" would be "best served" by proceeding to sentencing.

Defense counsel opposed the motion, arguing that the convictions at issue and the pending murder charge were "all wrapped up together," and thus proceeding to sentencing before the third trial would hinder Mr. Decuir's ability to fully allocute

at sentencing because he would need to "choose between being forthcoming at a separate sentencing for the gun and obstructionist conduct or standing mute out of a fear that something he might say to the PSR writer or the court could be used against him at the retrial." The court granted the government's motion over the defense's objection. On the advice of counsel, Mr. Decuir did not participate at the sentencing.

Mr. Decuir argues that the court abused its discretion when it granted the government's motion to proceed to sentencing. He alleges that his Fifth Amendment privilege against self-incrimination was pitted against his right to be heard at his sentencing hearing. We disagree.

A criminal defendant "has a right to allocute in an effort to mitigate his punishment." *Warrick v. United States*, 551 A.2d 1332, 1335 (D.C. 1988) (first citing D.C. Code § 23-103 (1981); and then citing Super. Ct. Crim. R. 32(c)(1)). While our court's jurisprudence on allocution is scant, there is a substantial body of federal case law clarifying that sentencing judges have vast discretion on questions of allocution. *United States v. Ward*, 732 F.3d 175, 182 (3d Cir. 2013) ("The sentencing judge has always retained the discretion to place certain restrictions on what may be presented during an allocution."); *United States v. Mack*, 200 F.3d 653, 658 (9th Cir. 2000) ("[A]lthough [defendants have] a right of allocation at sentencing, that right is not unlimited."); *United States v. Li*, 115 F.3d 125, 133 (2d

Cir. 1997) ("[A] defendant's right to allocution is not unlimited in terms of either time or content."). So long as the court provides a defendant with the opportunity to speak on his behalf at sentencing, the defendant has been properly afforded the chance to allocute. *United States v. Alsante*, 812 F.3d 544, 548 (6th Cir. 2016) (holding that the sentencing hearing was "fundamentally fair" even though the defendant declined the court's invitation to "make a statement in allocution"); *Ward*, 732 F.3d at 182 (discerning no error where the judge "personally address[ed] the defendant and offer[ed] him the opportunity to address the court before the sentence [was] pronounced"); *United States v. De La Paz*, 698 F.2d 695, 697 (5th Cir. 1983) (per curiam) (similar).

There are also several federal cases rejecting arguments similar to Mr. Decuir's claim that the pending criminal charges created an impermissible conflict between the right of allocution and the right to avoid self-incrimination. *See, e.g.*, *Alsante*, 812 F.3d at 548 (rejecting the argument that the defendant's Fifth Amendment rights were violated where he could not fully allocute without discussing a pending case); *United States v. Smith*, 705 F.3d 1268, 1274 (10th Cir. 2013) ("Like any other defendant, [appellant] had the choice to either exercise his Fifth Amendment right to remain silent at the sentencing hearing or to risk incriminating himself with respect to . . . unresolved criminal charges."); *De La Paz*, 698 F.2d at 697 (explaining that the sentencing judge "has not deprived a defendant

of his right of allocution when it keeps him from incriminating himself at the sentencing"). We are persuaded by these cases and discern no reason to reach a different conclusion under the District's allocution statute.

We thus conclude that the trial court did not abuse its discretion in granting the government's motion to proceed to sentencing or in conducting the sentencing hearing. The court provided Mr. Decuir the opportunity to speak, and he declined. The choice between contesting the government's evidence at the sentencing hearing and risking self-incrimination is the same dilemma that many defendants face at various points in a criminal prosecution where they have the opportunity to speak. *See Alsante*, 812 F.3d at 548 ("[Defendant] no doubt felt pressure to rebut the government's evidence so that he could reduce his sentence. That is the same pressure, however, felt by *every* defendant who must decide whether to testify or remain silent."); *see also Harvey v. Shillinger*, 76 F.3d 1528, 1534-37 (10th Cir. 1996) (explaining that there was no error where the defendant had to choose between testifying at a federal sentencing or remaining silent due to pending state charges). Accordingly, we find no basis to hold that the trial court erred when it granted the government's motion to proceed to sentencing.

### III.   Conclusion

For the foregoing reasons, we reverse Mr. Decuir's convictions for second-degree murder and the related PFCV charge and remand for further proceedings. We affirm Mr. Decuir's remaining convictions.

*So ordered*.