*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0016

ONZAY LAMARR GIBBS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2016-CF1-017604)

(Hon. Ronna L. Beck, Trial Judge)

(Argued October 25, 2022      Decided April 23, 2026)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew Graves*, United States Attorney, at the time of argument, with whom *Chrisellen R. Kolb*, *Elizabeth Danello*, and *Brittany Keil*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH and HOWARD, *Associate Judges*, and GLICKMAN, *Senior Judge*.[*]

Opinion for the court by *Associate Judge* HOWARD.
Concurring opinion by *Senior Judge* GLICKMAN at page 37.

---

[*] Judge Glickman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on December 21, 2022.

HOWARD, *Associate Judge*: Appellant Onzay Lamarr Gibbs appeals from the trial court's denial of his motion to suppress evidence obtained from a search of his smart phone. Mr. Gibbs contends that the warrant authorizing the search does not pass constitutional muster under our decision in *Burns v. United States*, 235 A.3d 758 (D.C. 2020). We agree and, therefore, reverse the judgment of the Superior Court denying suppression of the cell phone search, vacate Mr. Gibbs's convictions, and remand for further proceedings consistent with this opinion.

## I.     Background

On September 15, 2016, officers of the Metropolitan Police Department (MPD) were dispatched to 3341 23rd Street, S.E., in response to a reported stabbing. Upon arriving, the officers found a man named Keith Jenkins lying in the walkway to a parking lot. Mr. Jenkins had stab wounds on his face, neck, and body. The police brought him to an area hospital where he was admitted in critical and unstable condition and underwent emergency surgery. Ultimately, because of the medical intervention, Mr. Jenkins survived.

On September 20, 2016, MPD Detectives Anthony Greene and Dwight Jones went to the hospital to interview Mr. Jenkins, who had completed a medical procedure and was on pain medication. Mr. Jenkins described the events leading to

the stabbing as a drug deal gone awry. Mr. Jenkins told the detectives that, on the evening of the stabbing, he was walking toward the parking lot in the 2000 block of Savannah Terrace, S.E., with an individual he identified as "Anjae," (spelled phonetically as written by Detective Greene in his report) and whom Mr. Jenkins later identified from a photograph as Mr. Onzay Gibbs.[1] They intended to meet with several individuals, who were unknown to Mr. Jenkins, to conduct a marijuana deal. Mr. Jenkins said that when he and Mr. Gibbs arrived at the parking lot, somebody he could not identify hit him from behind and he was forced into a car. Mr. Jenkins remembered seeing Mr. Gibbs in the front passenger seat of the same vehicle and believed that there were at least two additional individuals in the vehicle. Mr. Jenkins told the detectives that as the attack was occurring, he said to Mr. Gibbs, "You going to do this to me[.] As long as I've known you!"

Mr. Jenkins provided a somewhat different, although more detailed, account to Detectives Greene and Jones when they reinterviewed him and showed him Mr. Gibbs's photo on October 18, 2016. Mr. Jenkins told the detectives that he and Mr. Gibbs were walking together on the night of the assault when Mr. Gibbs said, "get in the car!" Mr. Gibbs then pushed him inside the vehicle. There were two other

---

[1] During his October 18, 2016, interview Mr. Jenkins confirmed the identity of "Anjae" by photograph—which was that of Mr. Gibbs—we thus refer in this opinion to Mr. Gibbs where the trial transcript may reflect "Anjae."

unknown individuals inside the vehicle. At some point, Mr. Jenkins and Mr. Gibbs began "tussling," and Mr. Jenkins said to Mr. Gibbs "[w]hy are you doing this to me?" Mr. Gibbs shouted, "shut the fuck up," while making slashing motions in Mr. Jenkins's direction. Mr. Jenkins told the detectives that he had a small amount of marijuana and his personal identification in his possession before the assault; those items were not on Mr. Jenkins's person when responding officers located him.

At trial Mr. Jenkins's story changed again. Mr. Jenkins made no mention of a drug deal, testifying instead that he was robbed of gambling winnings. According to his trial testimony, Mr. Jenkins was shooting dice with Mr. Gibbs and others whom he knew "from the neighborhood" in the parking lot of his apartment building at 2015 Savannah Terrace, S.E. Mr. Jenkins said he won $250 that evening.

Mr. Jenkins testified that he then decided to walk to a corner store to buy beer before it closed. Mr. Gibbs offered to accompany Mr. Jenkins. On the way to the store, Mr. Gibbs stopped to talk to someone in a car. Mr. Gibbs told Mr. Jenkins that the people in the car would give them a ride to the store, but Mr. Jenkins refused to get in the car. Mr. Gibbs pushed Mr. Jenkins towards the car. Mr. Jenkins could not remember what happened next. While Mr. Jenkins was "trying to get [himself] together," he remembered asking Mr. Gibbs, "[W]hy are you doing this to me? What did I do?" Mr. Gibbs "kept pushing [Mr. Jenkins] back, telling [him], get the F back,

get the F back." Mr. Jenkins explained that Mr. Gibbs was "throwing punches" and "swinging" at his face; "every time [Mr. Gibbs] hit [him], [he] could feel a nick" and was bleeding. The next thing that Mr. Jenkins remembered was waking up at the hospital. He later discovered that the money he won at the dice game was missing, along with other personal items he had been carrying.

Following the assault, detectives interviewed several witnesses, including one identified only as W-2 in their affidavit. W-2 said that, on the night of the assault, they observed a man, later identified as Mr. Jenkins, walking down the street with a "black male, medium complexion, 23 or 24 years of age, [with a] small build[ and] curly hair." W-2 gave the officers the companion's address and on October 12, 2016, Detectives Greene and Jones went to that apartment to identify its occupants. While there, they spoke with the leaseholder, who confirmed that Mr. Gibbs lived in the apartment.

On October 26, 2016, police arrested Mr. Gibbs and seized his cell phone— an Alcatel Onetouch—incident to the arrest. Mr. Gibbs confirmed that the cell phone recovered from his person was, indeed, his cell phone.

On November 9, 2016, Detective Greene sought a search warrant for Mr. Gibbs's cell phone. In his affidavit supporting his request for the warrant, after summarizing his interviews of Mr. Jenkins and W-2, Detective Greene stated:

> Based on the facts set forth in this affidavit, it is your affiant's belief that information contained in [Mr. Gibbs's cell phone] is information of evidentiary value in this case. This affiant respectfully requests . . . a search warrant authorizing the search of the listed cellular telephone device for any and all [d]ata files to include but not limited to, contacts, applications, photographs, emails, and any other data stored on the aforementioned cellular telephone device.

A judge of the Superior Court (the warrant judge) approved the requested warrant. Special Agent John Marsh of the United States Attorney's Office executed the warrant on November 15, 2016. Special Agent Marsh "export[ed] everything from the [cell phone's] contents out into a report." The total report, which was "in the thousands" of pages, displayed the information from Mr. Gibbs's cell phone, broken down by data type. The report yielded, among other things, 32,876 SMS messages, 1,014 MMS messages,[2] 750 call-log entries, 9,726 images, 402 videos, 1,355 contacts, 4,582 locations, and 480 web history files.

Among this data, the report revealed a plethora of messages between Mr. Gibbs and others, after the incident, that evidenced his involvement in the stabbing of Mr. Jenkins. For example, Mr. Gibbs sent a message informing an associate that,

---

[2] SMS messages refers to "short message service" text messages which consist of simple word text messages. MMS messages refers to "multimedia messaging service" text messages which allow transmission of images, video, and other multimedia content.

"[t]hey saying he ain't die now, he in critical condition[]"; another associate messaged Mr. Gibbs saying, "I thought u was never goin come back, I was goin miss you[]"; to which Mr. Gibbs responded, "I am jus[t] playing everything by ear, they saying now he ain't die," and "[H]e [can't] talk tho"; and perhaps the most incriminating, a text from Mr. Gibbs to yet another associate, "I left my knife in tha van."

On June 29, 2017, a grand jury returned an indictment against Mr. Gibbs, charging him with four felonies: (1) assault with intent to kill while armed, D.C. Code §§ 22-401, -4502; (2) kidnapping while armed, D.C. Code §§ 22-2001, -4502; (3) aggravated assault while armed, D.C. Code §§ 22-404.01, -4502; and (4) robbery while armed, D.C. Code §§ 22-2801, -4502.

On March 9, 2018, Mr. Gibbs moved to suppress the fruits of the cell phone search, which the government opposed. The Superior Court denied Mr. Gibbs's motion, concluding that "there was a substantial basis for the judge to find probable cause for the warrant and that the warrant was not overbroad." More specifically, the trial court found that there was:

> probable cause to believe that the defendant's whereabouts, other individuals who were involved, the defendant's conduct in the aftermath of the crime would be reflected on the cell phone. And, alternatively, if the warrant . . . [was] overbroad, the warrant was not a general

warrant. And the inculpatory portions would still be admissible.

The trial court also found that the electronic data recovered from the cell phone should not be suppressed based on the good-faith exception established in *United States v. Leon*, 468 U.S. 897 (1984).

After a five-day trial, a jury found Mr. Gibbs guilty of assault with intent to kill and aggravated assault but acquitted him of kidnapping and robbery charges. The Superior Court sentenced Mr. Gibbs to concurrent prison terms of 240 months for the assault with intent to kill and 144 months for the aggravated assault, followed by five years of supervised release. This timely appeal followed.

While the case was pending appeal, the government filed an unopposed motion to stay the appeal pending this court's resolution of a case addressing similar issues concerning the validity of a warrant to search a cell phone in *Burns v. United States*, 235 A.3d 758 (D.C. 2020). We granted that motion and subsequently each party submitted briefing on the matter with the benefit of this court's opinion in *Burns*.

## II.    Standard of Review

Our review of a denial of a motion to suppress is "limited." *Castellon v. United States*, 864 A.2d 141, 148 (D.C. 2004) (citing *Gatlin v. United States*, 833 A.2d 995, 1005 (D.C. 2003)).  "In reviewing the denial of a motion to suppress, this court must uphold the trial court's findings of fact unless clearly erroneous and view all facts and reasonable inferences in the light most favorable to the government." *Butler v. United States*, 102 A.3d 736, 739 (D.C. 2014) (citing *Prince v. United States*, 825 A.2d 928, 931 (D.C. 2003)).  However, we review de novo the trial court's legal conclusions and make our own independent determination on whether there was probable cause to support a search.  *Shelton v. United States*, 929 A.2d 420, 423 (D.C. 2007) (citing *Prince*, 825 A.2d at 931).

## III.    Discussion

On appeal, Mr. Gibbs argues that the search warrant granting access to the contents of his cell phone violated the Warrant Clause of the Fourth Amendment. Mr. Gibbs avers that the warrant was constitutionally deficient because (1) its "affidavit was entirely devoid of probable cause to believe the cell phone contained any evidence of the assault whatsoever," and (2) it failed to "describ[e] even a single piece of evidence sought, or set[] any limitations as to time or specific applications

that may be searched." Ultimately, Mr. Gibbs contends, "the cell phone search warrant here suffered each of the fatal infirmities discussed by this [c]ourt in *Burns*."

The government argues that this case is distinguished from *Burns* because (1) detectives "had probable cause to believe Mr. Gibbs participated in the stabbing . . . [and] that the stabbing was a coordinated attack perpetrated by multiple individuals" for which "evidence . . . would exist on the cell phone of the perpetrators," and (2) "[t]he warrant was sufficiently particularized and did not suffer from overbreadth." Alternatively, the government contends that the good-faith exception would otherwise apply such that the fruits of the cell phone search should not be suppressed.

We begin with determining whether the warrant in question satisfies the probable cause and particularity requirements of the Fourth Amendment. Concluding that the warrant did not, we turn to the applicability of the good-faith exception, which also offers the government no reprieve here. Finally, we address any prejudice suffered by Mr. Gibbs based on the constitutionally infirm warrant and the subsequent seizure of the contents of his cell phone. We conclude that the fruits of the unconstitutional search must be suppressed.

### A. The Cell Phone Warrant Violated the Warrant Clause

The Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. The Warrant Clause is the primary procedure ensuring that the Fourth Amendment's protection against unreasonable searches is fulfilled. *See, e.g.*, *United States v. Chadwick*, 433 U.S. 1, 6-9 (1977); *see also In re J.F.S.*, 300 A.3d 748, 757 (D.C. 2023) ("These 'dual constitutional mandates of probable cause and particularity . . . are meant to deny the police the ability "to rummage at will" through a person's private matters.'" (quoting *Burns*, 235 A.3d at 771)).

"Probable cause exists when 'there is a fair probability that . . . evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In the context of a search warrant, probable cause requires a showing of "a nexus between the item to be seized and [the] criminal behavior under investigation." *Burns*, 235 A.3d at 771 (citation modified). While probable cause is a fluid concept that may be based on "common-sense conclusions about human behavior," *Gates*, 462 U.S. at 231-32, there must be "more than mere suspicion that criminal activity has taken place," *Abney v. United States*, 273 A.3d 852, 863 (D.C. 2022) (citing *Wade v. United States*,

173 A.3d 87, 92 (D.C. 2017)). To meet this standard, the government need only make a showing of "the probability, and not a prima facie showing, of criminal activity . . . to establish probable cause." *Abney*, 273 A.3d at 863 (citing *Wade*, 173 A.3d at 92).

With respect to search warrants, the supporting "[a]ffidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Gates*, 462 U.S. at 239. When doing so, the magistrate must ensure that sufficient information is provided in the affidavit such that the magistrate's approval is not "a mere ratification of the bare conclusions of others." *Id.* Accordingly, a supporting affidavit for a search warrant does not establish probable cause where it "states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, [or] is a "bare bones" affidavit.'" *Burns*, 235 A.3d at 772 (quoting *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008)).

Probable cause is just one of the mandates of the Warrant Clause. U.S. Const. amend. IV. A search warrant must also be sufficiently particularized to pass constitutional muster. *Id.* The particularity requirement "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 U.S.

551, 561 (2004) (quoting *Chadwick*, 433 U.S. at 9) (citation modified). Therefore, "unless the particular items described in the affidavit are also set forth in the warrant . . . there can be no written assurance that the [m]agistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560 (citing *McDonald v. United States*, 335 U.S. 451, 455 (1948)).

It is well established that a search warrant is required for cell phone searches. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 401 (2014). Courts have come to understand the necessity of search warrants for cell phones due to their unique ability to open a particularly "intimate window into a person's [private] life." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). As the Supreme Court has explained, "the collection of so much varied and sensitive information on a single device, carried almost everywhere by its owner, facilitates in an unprecedented way the 'reconstruct[ion]' of '[t]he sum of an individual's private life' and 'convey[s] far more' about a person than could previously be found in the search of a physical space." *Burns*, 235 A.3d at 772 (citing *Riley*, 573 U.S. at 394).

## 1.    Probable cause

We discuss *Burns* at length because the same constitutional infirmities present there exist in the instant case. In *Burns*, the appellant challenged the trial court's denial of his motion to suppress the fruits of cell phone searches conducted pursuant

to a warrant that the appellant argued was neither supported by probable cause nor sufficiently particularized. *Id.* at 766. At the time of the seizure of his cell phones, the appellant informed detectives that he exchanged text messages with the decedent throughout the day of the decedent's death, with his final communication occurring a few hours before the decedent's death. *Id.* at 768-69. Detectives learned that the appellant had also been communicating with his cousin by phone on that same evening. *Id.* An MPD detective sought and was granted a search warrant that "authorized an unlimited review of the contents of [the appellant's] cell phones for 'any evidence' of murder." *Id.* at 767.

The search warrant granted by the warrant judge in *Burns* was supported with an affidavit summarizing the detective's interview with the appellant, his cousin, and the appellant's mother, who also lived in the apartment where the decedent was found. *Id.* at 768. The affidavit also recounted the 911 call made by a neighbor reporting the sounds of gunshots, the events leading to officers' discovery of the decedent's body, and an autopsy report placing the manner of death as homicide. *Id.* at 768-69. With solely that information, the detective asserted "that there is probable cause that evidence related to this homicide may be contained in the [appellant's] cellular telephone devices"; and that access to "this information could establish the whereabouts of [the appellant and his cousin's] cellular telephones on the night and the time of the murder and help identify potential witnesses, suspects, and

confederates yet unknown." *Id.* at 769. The warrant sought access to a wide array of information stored within the cell phones including text messages, call logs, contact lists, photographs, and internet search history. *Id.* at 769-70.

On review, we concluded that the search warrants did not satisfy the Warrant Clause. *Id.* at 774. More precisely, we held:

> It is not enough for police to show there is probable cause to arrest the owner or user of the cell phone, or even to establish probable cause to believe the phone contains some evidence of a crime. To be compliant with the Fourth Amendment, the warrant must specify the particular items of evidence to be searched for and seized from the phone and be strictly limited to the time period and information or other data for which probable cause has been properly established through the facts and circumstances set forth under oath in the warrant's supporting affidavit.

*Id.* at 773. We determined that the supporting affidavits established probable cause for three discrete items: (1) the text messages between the appellant and decedent, (2) the call log to determine the time the appellant called his cousin, and (3) the GPS tracking features on the cell phones to determine the appellant's location at pertinent times on the evening of the murder. *Id.* at 774. With respect to all other categories of areas searched, we concluded that the supporting affidavit "stated no facts that even arguably provided a reason to believe that any other information or data on the phone had any nexus to the [murder] investigation." *Id.* Further, we held that the

warrant was fatally overbroad because "the warrants broadly authorized the seizure of 'any evidence' on the phones and listed, . . . generic categories covering virtually all of the different types of data found on modern cell phones." *Id.* at 775.

Here, unlike the supporting affidavits in *Burns*, we hold that Detective Greene's supporting affidavits failed to establish probable cause for any search of Mr. Gibbs's cell phone, much less any narrower pieces of information as we found in *Burns*. The affidavit submitted in support of the search warrant for Mr. Gibbs's cell phone failed to provide facts that could lead to reasonable inferences that the cell phone contained evidence of the crime under investigation.

First and foremost, Detective Greene's affidavit summarized the relevant investigation including several interviews with Mr. Jenkins and witnesses in the area before and after the stabbing. That recounting of the investigation did not contain any indication that Mr. Gibbs used, or was observed using, his cell phone at all. To be sure, we do not mean that to say that allegations of phone usage close in time to the commission of the crime is a prerequisite for a cell phone search. *See, e.g.*, *Commonwealth v. Henley*, 171 N.E.3d 1085, 1110-11 (Mass. 2021) (reasoning that "highly unusual combination of factors" plus "police training and expertise"—all of which was indicated in the affidavit—demonstrated that the suspect was likely tipped off to the complainant's whereabouts by a fellow conspirator, which would

have been unlikely without cell phone communication of some nature); *Glispie v. State*, 793 S.E.2d 381, 385 (Ga. 2016) (finding that where the warrant application contained evidence of drug distribution, the probable cause requirement for a cell phone search warrant had been satisfied because "it was reasonable for the magistrate to infer that the cell phones in [the defendant's] possession at the time of his arrest were used as communicative devices with third parties for drug deals"). But, the nexus between a cell phone and probable cause must be more direct and "may be found in the type of crime, the nature of the evidence sought, and normal inferences as to where such evidence may be found." *See Commonwealth v. White*, 59 N.E.3d 369, 375 (Mass. 2016) (citation modified).

That nexus does not exist here. Detective Greene's affidavit recounted two interviews in which Mr. Jenkins identified Mr. Gibbs as his sole attacker. During those interviews, Mr. Jenkins mentioned that Mr. Gibbs pushed him into a vehicle and that he could hear other occupants inside of the vehicle. However, the scant details concerning how the vehicle came to be involved (i.e., whether the vehicle was somewhere parked when Mr. Gibbs began forcing Mr. Jenkins inside or whether the vehicle pulled up as the pair were walking to the store), the lack of any indication in the affidavit that the vehicle's occupants and Mr. Gibbs were coordinating before the attack, and Mr. Jenkins's statement that Mr. Gibbs was his sole attacker, make it

difficult to infer that evidence of the crime might be on Mr. Gibbs's cell phone—e.g., evidence that cellular coordination was at play.

Although facts may exist that could have justified such an inference, the affidavit submitted by Detective Greene did not include those facts. The affidavit did not allege that Mr. Gibbs had a cellphone on his person when he attacked Mr. Jenkins. The affidavit did not include a discussion about the multiple individuals involved in the attack or the level of coordination they would have needed to carry out their assault. As previously mentioned, the affidavit did not contain witness observations that Mr. Gibbs had used a phone leading to the attack. Without any indication that a phone was on Mr. Gibbs's person or involved in Mr. Jenkins's assault, it is difficult to infer, for example, that any immediate messages were sent that would have been relevant to the commission of the crime, or that the phone contained relevant GPS data to shed light on Mr. Gibbs's whereabouts at the time of the attack.

We note, however, that it is not so unreasonable to assume that if Mr. Gibbs had a cell phone with him at the time of the attack, it may contain some data relevant to the alleged crime, i.e. locational data. However, a nexus must still be established between evidence sought and the alleged crime committed to justify the search. The affidavit here does not develop even the slightest factual allegations that Mr. Gibbs's

cell phone contains *any* relevant information. A cell phone is not mentioned until the final paragraph of the affidavit where Detective Greene asserts in conclusory fashion, without referencing the underlying investigation, that information contained within the cell phone has evidentiary value. Without a nexus we cannot then conclude that any locational data on the cell phone is relevant to the alleged crime based solely on the fact that the phone exists.

Explanation from Detective Greene, based on his training, experience, and observations, could have helped bridge that gap between the facts alleged and the reasonable inferences needed to find probable cause to search Mr. Gibbs's phone. Detective Greene could have discussed how phones are often used in these types of violent assaults or, alternatively, how they are used to coordinate drug deals— because Mr. Jenkins told officers that he and Mr. Gibbs were initially meeting to go buy marijuana—so that it would have at least been reasonable to infer that Mr. Gibbs had a phone with him when he attacked Mr. Jenkins and that it contained relevant information. But Detective Greene did not include any discussion as to why he believed that Mr. Gibbs's phone contained information of evidentiary value to the case.

Without any attestation, and with the few relevant facts laid out in the affidavit, it is difficult to infer Mr. Gibbs's cell phone contains any evidence relevant

to Mr. Jenkins's assault, let alone that there is sufficient probable cause to search the contents of his cell phone for that reason.[3] We caution, however, that attestations of experience, on their own, are not enough to establish probable cause. *See Burns*, 235 A.3d at 772 ("claim[s] of probable cause based on an affiant's 'training and experience' fails to provide . . . a sufficient factual basis to assess compliance with the Fourth Amendment."). Any attestation should be coupled with the facts to allow reasonable inferences to properly support probable cause.

While the warrant judge is entitled (and required) to draw their own reasonable and common-sense inferences with respect to the information provided in a supporting affidavit, the factual circumstances laid out in Detective Greene's affidavit do not give rise to a fair probability that a cell phone is at all relevant to the crime. *See Aguilar v. Texas*, 378 U.S. 108, 111 (1964) (noting that the Fourth Amendment "requir[es] that those inferences [from the evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in . . . ferreting out crime"); *Burns*, 235 A.3d at 771 ("A judge considering an application for a search warrant must determine whether, in light of all the circumstances described in the supporting affidavit, 'there is a fair probability that contraband or

---

[3] When seeking a cell phone search warrant, officers should—and often do—include an explanation of how cell phones are used in carrying out the crime under investigation.

evidence of a crime will be found in a particular place.'" (quoting *Gates*, 462 U.S. at 238)).

Finally, the government contends that probable cause was also sufficient because Mr. Gibbs was a suspect at the time the warrant was sought.[4] We are unpersuaded by this argument. Regardless of Mr. Gibbs's suspect status, the affidavit supporting the search warrant remained devoid of any "factual circumstances" displaying a connection or relation between the contents of Mr. Gibbs's cell phone and the events in question. *Id.* 772.

Returning to *Burns*, we determined that the government's affidavit to search Mr. Burns's phone lacked probable cause despite Mr. Burns's status as a witness and the likelihood that his phone contained information that would have helped investigators identify potential witnesses or suspects. *Id.* at 781. We concluded the affidavit to search Mr. Burns's phone "stated no facts that even arguably provided a reason to believe that any information or data on the phones had any nexus to the investigation." *Id.* at 774. Our holding did not depend upon Mr. Burns's status as a

---

[4] The government points to a variety of out of jurisdiction cases for the proposition that suspected involvement in a crime could be enough to establish probable cause to search the individual's phone. We find those cases to be inapposite because of our holding in *Burns* where we refused to support the "rubber stamping" of "unadorned, bare bones claim[s] of probable cause based on an affiant's 'training and experience.'" *Burns*, 235 A.3d at 772.

witness or law enforcement's "interest in discovering leads or otherwise furthering [their] investigation." *Id.* at 777. *Burns's* probable cause and particularity analyses (a) never mentioned Mr. Burns's status as a suspect or witness; (b) likened Mr. Burns's situation to a case involving a search warrant for a suspect's cell phone where the affidavit, alleging the suspect sent a text message to the victim, did not support probable cause to search, *see id.* at 775-76 (on particularity, identifying "the case with the most closely analogous facts" as one involving a "search warrant for a cell phone [police] had seized from the chief suspect in the case") (citing *United States v. Morales*, 77 M.J. 567, 571-73 (A. Ct. Crim. App. 2017)), and; (c) analogized Mr. Burns to a neighbor witness who called 911 only to highlight the absurdity of the government's particularity claim, *see id.* at 777 ("that probable cause to believe the neighbor's phone contained a log showing the exact time of the 911 call—from which the time of the shooting, a material fact in the investigation, could have been inferred—would have been insufficient to support an unlimited warrant.").

Indeed, "[i]t is not enough for police to show there is probable cause to arrest the owner or user of the cell phone, or even to establish probable cause to believe the phone contains some evidence of a crime." *Id.* at 773. If the government cannot establish a nexus between the crime and the evidence sought, the government does not have probable cause to search.

As previously discussed, the government failed to establish that nexus. We conclude here, for the same reasons we did in *Burns*, that the need to search the contents of Mr. Gibbs's phone is not moved by the fact that he was a suspect of the crime investigated. The government's need to develop leads in an investigation does not vitiate Mr. Gibbs's Fourth Amendment protections. In fact, we determined no matter how understandable the government's interest is in developing their investigation, that interest "is never an acceptable substitute for the constitutionally required showing of probable cause that must be made before a search warrant may be issued." *Id.* at 777. "Police might often believe that data on a smart phone could shed light on the way a crime was committed or 'help identify potential witnesses, suspects and confederates yet unknown,'" but "without a proper showing of probable cause, a search warrant is not available as a general investigative tool for law enforcement." *Id.*

Accordingly, the facts and attestations (or lack thereof) outlined in Detective Greene's affidavit do not support a reasonable inference that Mr. Gibbs's cell phone could have been used in the commission of the crime.[5]

---

[5] We note that it is reasonable to infer, without evidence showing otherwise, that the phone seized incident to Mr. Gibbs' arrest, six weeks after the commission of the crime, was the same phone he would have had at the time of the stabbing.

## 2.    Particularity

We also hold that the search warrant was not sufficiently particularized. Similar to the cell phone search warrants in *Burns*, the warrant here "describe[d] the objects of the search in the most general terms imaginable." 235 A.3d at 774. Here, the search warrant described the place to be searched as:

> any and all [d]ata files to include but not limited to, contacts, applications, photographs, emails, and any other data stored on the aforementioned cellular telephone device. It is also your affiant's belief that this information could help inculpate or exculpate Onzay Gibbs and identify potential suspects, witnesses or associates of Onzay Gibbs.

The only particularized description we are provided in this search warrant is that of the model and serial number of the cell phone, which we do not list in this block quote. The description fails to make any specific mention of call logs, text messages, or any data that the government ultimately relied on. Nor does it make any specific mention of a timeframe of the data that it sought to obtain. The request can be summarized as being for "all data"—the additional examples do little to particularize the request and are explicitly part of a nonexclusive list.

---

*Abney*, 273 A.3d at 865 (citing with approval a Connecticut case's observation that it was a "reasonable inference that cell phones typically are retained and used for months or years" (citation modified)).

While we have already established that the warrant failed to provide probable cause for any search of the phone, even if it had established probable cause for some information on the cell phone, the warrant does not make any effort to narrow the scope of what data the search is intended to cover. *See Groh*, 540 U.S. at 561 ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request.").

In an attempt to persuade us that the warrant was sufficiently particularized, the government contends that it was "simply impossible" for officers to know exactly where evidence of the offense would be stored. We remain unconvinced by this argument. While the officers may not have known *exactly* where the evidence they sought was located, we can say with some degree of certainty that they would not find evidence of a stabbing on say: Mr. Gibbs's Southwest Airlines application, the Uber application, the Amazon application, or any of the various applications without a messaging function that are stored on his phone. This demonstrates the constitutional infirmity of an "all data files" request. The burden lies on the officer to identify the applications, data, and time frame that he or she intends to search with particularity. *Burns*, 235 A.3d at 778.

In that regard, similar to our conclusion in *Burns*, this search warrant authorizes a general exploratory search, which is prohibited by the Fourth Amendment.

### B.     The Good-Faith Exception Is Inapplicable

Mr. Gibbs argues that the good-faith doctrine is inapplicable because Special Agent Marsh's reliance on the search warrant was not objectively reasonable.  More specifically, Mr. Gibbs contends that (1) the warrant here, like the warrant in *Burns*, was "bare bones" because it "articulated no facts whatsoever to establish a nexus between Mr. Gibbs's phone and the offense" and (2) it "suffer[ed]" from the "same truly extreme overbreadth that infected the warrants in *Burns*" because "it, too, authorized a search of everything on the phone."  The government counters that the trial court correctly applied the good-faith exception because "[i]t was a natural and reasonable inference" that evidence would likely be found on Mr. Gibbs's phone. Because we find that the warrant, on its face, lacked particularity given the state of the law in November 2016, we conclude that the good-faith exception is inapplicable since officers could not reasonably presume it was a valid warrant.  *See Leon*, 468 U.S. at 923.

"It has long been the law that evidence collected in violation of the Fourth Amendment is considered 'fruit of the poisonous tree' and generally may not be used

by the government to prove a defendant's guilt." *Hooks v. United States*, 208 A.3d 741, 750 (D.C. 2019) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). One exception to this general exclusionary rule is the good-faith doctrine, created in *Leon*, 468 U.S. at 897. In *Leon*, the Supreme Court held that the exclusionary rule does not apply where officers reasonably rely on a subsequently invalidated search warrant. *Id.* at 925-26. The Supreme Court reasoned that where "the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment," the deterrent effect of the exclusionary rule is not fulfilled and therefore should not apply. *Id.* at 918-21. "Essential to the objective nature of the inquiry is the expectation that law enforcement officers 'have a reasonable knowledge of what the law prohibits.'" *Burns*, 235 A.3d at 778 (citing *Leon*, 468 U.S. at 919 n.20).

We have had four occasions to address the applicability of the good-faith exception in the context of cell phone search warrants: *Burns*, *Abney*, and now post oral argument, *In re J.F.S.* and *Jennings*. In *Burns*, we concluded that, because "the affidavits submitted here were bare bones (or less) . . . on this ground alone, the good faith exception provide[d] the government no refuge from the exclusionary rule." 235 A.3d at 779. We also determined that the good-faith exception was inapplicable due to the detective's use of "boilerplate language of a template" and failure to make any "effort to tailor [the warrant's] scope to the facts of the case or the slender

showings of probable cause made in the supporting affidavits," resulting in warrants of "truly extreme overbreadth." *Id.* Quoting the Supreme Court, we held that "the inquiry comes down to 'whether a reasonably well trained officer,' reasonably knowledgeable about what the law prohibits, 'would have known that the search was illegal despite the magistrate's authorization.'" *Id.* at 778 (quoting *Leon*, 468 U.S. at 922).

Thereafter, in *Abney*, we clarified that, in applying the good-faith exception, we must "assess the reasonableness of the officers' reliance in light of the law at the time of the warrant's issuance and execution." 273 A.3d at 862. Similar to the facts of *Burns* and the instant case, *Abney* concerned a search warrant for a cell phone. *Id.* However, unlike *Burns*, we held that the officers could have reasonably believed that the affidavit established probable cause for evidence of the underlying crime. *Id.* at 865. We did so because "[a]s of 2018 . . . a number of other courts had either found probable cause or upheld cell-phone search warrants issued in analogous circumstances" but acknowledged that "[t]here was also authority pointing in the opposite direction." *Id.* at 864. Notably, we distinguished the facts of that case from *Burns* in two important ways: (1) the affidavit included an "indication that [the defendant] contacted [the complainant] via cell phone to set up the robbery," and (2) the affidavit included "general information . . . about cellphone use in similar circumstances." *Id.* at 865.

*Abney* is readily distinguishable from the facts of the instant case. First, unlike the instant scenario, the affidavit in *Abney* detailed specific allegations that the defendant used his cell phone in commission of the crime. Going further, in *Abney*, we determined that "[i]t appears to be undisputed that the warrant in this case permitted the officers to search the cell phone's contents only for evidence of the robbery." 273 A.3d at 866. However, in this case, Detective Greene's affidavit did not allege that a cell phone was used in the commission of the crime, and failed to even limit the scope of the search to evidence of the crime under investigation. As a result, *Abney* supports a determination that the good-faith exception is inapplicable here.

We move next to *In re J.F.S.* There we analyzed both *Abney* and *Burns* and further iterated that where an affidavit supporting a warrant contains details that give officers probable cause to believe that the individual to be searched is involved in the crime *and* that the data on their phone may be relevant to the crime, the good-faith exception may provide protection for the warrant. *In re J.F.S.*, 300 A.3d at 758.

In *J.F.S.* officers had submitted a "detailed affidavit" that "explained why officers had probable cause to believe that J.F.S. was involved in the murder and why a broad swath of data on the phone might contain relevant evidence." *Id.* That

detailed affidavit stated that officers could expect to find "messages about planning the crime in the phone's messaging app; 'trophy photos' of weapons in photo storage apps; and searches of police investigations into the crime in the internet search history." *Id.* Because of this level of detail in the affidavit, in addition to the defendant's status as a suspect in the crime, we held that officers could rely on the subsequent search warrant in good faith.

Although Mr. Gibbs was a suspect at the time of the warrant to search his phone was issued, just as the defendant in *J.F.S.*, the affidavit here does not explain in detail why any data "on the phone might contain relevant evidence." *Id.* Nor does the affidavit detail what information could be found or within which phone applications that information could be found. Detective Greene's affidavit provides such a "slender" showing of probable cause that it cannot provide a good-faith basis upon which a reasonably trained officer could thereafter rely. *Id.* at 758-59. Detective Greene's affidavit surely gave officers probable cause to believe that Mr. Gibbs was involved in the crime here, but it did not give them probable cause to believe his phone contained relevant data to the crime. Mr. Gibbs's status as a suspect in the case does not provide a basis for finding probable cause to search his phone absent more particularity in the affidavit under *J.F.S.*

This court recently applied the good-faith exception to certain affidavits in support of two search warrants for a defendant's cell phone in *Jennings v. United States*, 351 A.3d 1075 (D.C. 2026). Although both this case and *Jennings* are similar in that they pertain to an affidavit in support of a warrant to search the contents of a cell phone, *Jennings* is readily distinguishable from the instant case. In *Jennings*, we determined the facts alleged in the supporting affidavits, viewed in light of the detective's attestations based on their training and experience,[6] sufficiently linked

---

[6] In *Jennings*, Detective Weber, who drafted the affidavits reviewed on appeal, attested:

> Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity. . . .

> Based on my training and experience, I know that people who possess guns, illegal drugs, unlawfully obtained money, and other contraband in Washington, D.C., often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos." They also frequently share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services. Similarly, they often refer to their guns, illegal drugs, and other contraband in

the defendant's cell phone to the events underlying the charged crimes. *Id.* at 1095-96. We concluded "the affidavits and warrants . . . were not 'so lacking in indicia of probable cause' or 'so facially deficient' that it was 'unreasonable' for an officer to rely on judicial approval of them at that time." *Id.* at 1096 (quoting *Abney*, 273 A.3d at 862).

The warrant here is much more bare bones than the warrant in *Jennings*. Here, the warrant did not contain any attestations from Detective Greene to connect the factual allegations of Mr. Gibbs's assault with the need to search his cell phone. Additionally, the *Jennings* warrant also limited the search to evidence of the specific crime, *id.*, a limiting factor not present here. Although *Jennings* did not pass

> text messages, emails, or other written communications that are carried out by and stored on their cell phone. . . .
>
> Based on my training and experience, I know that victims, witnesses, and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.

*Jennings*, 351 A.3d at 1093-94.

judgment on whether the affidavits would have met *Burns's* probable cause and particularity requirements, *see id*, the *Jennings* warrants are consistent with the warrants that we held to have satisfied the good-faith exception in *Abney* and *In re J.F.S.* That is not the case here, where a reasonable officer could not have relied on Detective Greene's affidavit because it *did* lack indicia of probable cause.

The facts of this case are more analogous to *Burns*, and therefore the good-faith exception should not apply. In *Burns*, we held that our conclusion that the supporting affidavit was "bare bones" was sufficient for an exception to the good-faith rule's application. 235 A.3d at 779. In the instant case, we similarly conclude that Detective Greene's affidavit does not support reasonable inferences to establish probable cause with respect to *any* information found on the cell phone. Further, in *Burns*, we noted that because the warrant application "us[ed] the boilerplate language of a template and [without] effort to tailor [the government's] scope to the facts of the case or the slender showings of probable cause made in the supporting affidavits," the good-faith rule did not apply. *Id.* In a similar fashion, Detective Greene's affidavit did not narrow the specific types of information it sought from Mr. Gibbs's cell phone. In fact, the search warrant affidavit appears, in our review, to be an almost verbatim copy-paste of the language in the arrest warrant affidavit and casts further doubt whether the search warrant affidavit states with sufficient particularity that probable cause exists to search the contents of Mr. Gibbs's phone.

A reasonably well trained officer with reasonable knowledge about what the law prohibits knows (or at least should know) that a search warrant must be sufficiently particular and cannot be the largest of nets seeking to ensnare any and all things on a cell phone, without strong explicit reasons (other than those reasonably based on common sense by the warrant judge) to justify as much.[7] *See id.* ("any reasonably well-trained police officer with a reasonable knowledge of what the Fourth Amendment prohibits would have known they were invalid notwithstanding their approval by a judge").

The government seeks to distinguish Mr. Gibbs's case from *Burns* in an attempt to demonstrate that the good-faith exception saves the warrant here. We need not opine on the distinctions between Mr. Gibbs's case and *Burns* because those distinctions do not change the fact that on its face, the warrant here was deficient. Regardless of Mr. Gibbs's suspect status, his probationary status, or the supposed lack of evidence of gross negligence, we are satisfied that a reasonably well trained

---

[7] The government argues that our "robust showings of probable cause" language in *Burns* equates to some kind of exception to the particularity requirement. We disagree. We have repeatedly reiterated, and do so again today, that the affidavit must make a connection to why evidence would be found in the phone and where it may be found. A robust showing of probable cause cannot overcome that requirement. Moreover, we pointed out in *Burns* that messages could not be found in "internet search history, photographs, or any of the many other broad categories of data included in the unlimited, template-based search authorized by the warrants." *Id.* 235 A.3d at 776.

officer would not have believed in good-faith that the warrant in this case—for "all data files" contained on a cell phone without limitation and without any underlying discussion regarding the phone's relevance—was sufficiently particular to satisfy the requirements of the Fourth Amendment.

## C.    Prejudice

"An error of constitutional magnitude in the trial court requires reversal of a criminal conviction on appeal unless the government establishes that the error was harmless beyond a reasonable doubt." *Burns*, 235 A.3d at 791 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  "Under [this] heightened constitutional standard of review, the government bears the burden of demonstrating that . . . the verdict was surely unattributable to the erroneously admitted evidence." *Kaliku v. United States*, 994 A.2d 765, 775 (D.C. 2010) (citation modified).  "We consider 'not what effect the constitutional error might generally be expected to have upon a reasonable [factfinder], but rather what effect it had upon the guilty verdict in the case at hand.'"  *Brooks v. United States*, 39 A.3d 873, 889 (D.C. 2012) (quoting *Zanders v. United States*, 999 A.2d 149, 156 (D.C. 2010)).  Lastly, where the government does not argue harmlessness, we will affirm only when harmlessness is obvious.  *See* (*Gene*) *James v. United States*, 319 A.3d 384, 392 (D.C. 2024) ("The government does not argue that the trial court's failure to suppress the rifle was

harmless, which means we will affirm Mr. James's convictions 'only when harmlessness is obvious.' Because the rifle was one of the most incriminating pieces of evidence against Mr. James at both trials, it is not obvious that its admission was harmless[, and we reverse accordingly]." (citation modified)).

The government does not argue harmlessness on appeal; therefore, we review for obvious harmlessness. We conclude that the error here was not obviously harmless. The cell phone data introduced at trial was crucial to the government's case—the government introduced hundreds of text messages from Mr. Gibbs spanning weeks after the assault and repeatedly referenced those messages in its opening statement, examination of witnesses, and closing argument. *Andrews v. United States*, 922 A.2d 449, 460 (D.C. 2007) ("[R]epeated highlighting, during the course of trial, of . . . erroneously admitted [evidence] is persuasive evidence of its centrality and prejudicial character" (citing *Hill v. United States*, 858 A.2d 435, 448-49 (D.C. 2004)).

Indeed, the government's closing argument was particularly telling of the prejudicial nature of the cell phone evidence. The government began its closing argument with a quote from a text message sent by Mr. Gibbs, and stated that "all those text messages. . . . are showing you the defendant's guilty conscience." Further, the government dedicated nearly thirteen consecutive transcript pages worth

of its closing to recapping the cell phone evidence. As we have previously observed, "[the] prosecutor's stress upon the centrality of [the evidence] in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004) (internal quotation marks and citation omitted). For these reasons, we cannot conclude that the erroneously admitted cell phone evidence was obviously harmless. Thus, we are required to vacate Mr. Gibbs's convictions.

## IV. Conclusion

For the foregoing reasons, we reverse the Superior Court's order denying suppression of the cell phone search, vacate Mr. Gibbs's convictions, and remand this case for further proceedings consistent with this opinion.

*So ordered.*

GLICKMAN, *Senior Judge*, concurring: I join the opinion of the court. The overly general affidavit in this case failed to establish probable cause to believe any particular relevant evidence would be found on appellant's cell phone, and the applicant sought a warrant authorizing an unlimited search of all data files that the phone contained regardless of the lack of relevance to the crime under investigation. In consequence, the warrant approving the search of that phone authorized an

unbounded and unguided fishing expedition into all the data obtainable from the phone. This warrant was insufficiently particularized to pass constitutional muster.

I write separately to make two related observations: First, an affidavit demonstrating probable cause for a reasonably time-limited and targeted search of the cell phone, and a correspondingly particularized search warrant, could have been prepared in this case, which not only would have satisfied the Fourth Amendment, but also would have produced the same incriminating evidence as was recovered by the unconstitutionally broader search. Second, this foregone alternative outcome highlights the constitutionally important role of the judge to whom an application for a search warrant is made.

Regarding the first point, Jenkins told police about an apparently pre-planned and coordinated attack, in which appellant suddenly assaulted him as they were walking alone together and pushed him into a car that happened to be parked along their path and occupied by two persons whom Jenkins did not know. Six weeks after the attack, the police arrested appellant and lawfully seized his cell phone from his person. As I understand my colleagues to agree, *see ante* at 23 n.5, it was reasonably likely that appellant had this same phone in his possession at the time of the attack.

In my view the police therefore had probable cause to search the phone, narrowly, for GPS location data that could have established appellant's presence at

the time and place of the attack. In addition, the apparent participation in the attack by two unknown persons who happened to be waiting in a car at that location, into which appellant shoved Jenkins, made it reasonably likely that appellant had used his cell phone to coordinate the attack with them. The police therefore also had probable cause to carry out a targeted, time-limited search of the phone's messaging applications (including textual and recorded messages, phone call logs, and contact information) to identify the occupants of the car and to obtain evidence of incriminating communications between appellant and the car's occupants concerning the attack. *Cf. ante* at 29-33 (discussing this court's opinions in *In re J.F.S.*, 300 A.3d 748 (D.C. 2023), and *Jennings v. United States,* 351 A.3d 1075 (D.C. 2026)).

Such valuable evidence was lost to the government because the affidavit and search warrant did not comply with the requirements of the Fourth Amendment and instead were drafted too broadly to pass constitutional muster. And that brings me to my second point.

The magistrate's role is not only to approve or deny a search warrant application. Rather, the magistrate should feel empowered to implement revisions where necessary while resisting a natural inclination to defer to the expertise of the law enforcement officer. "[T]he Fourth Amendment has interposed a magistrate

between the citizen and the police . . . so that an objective mind might weigh the need to invade [the right of] privacy in order to enforce the law." *McDonald v. United States*, 335 U.S. 451, 455 (1948). The magistrate's decision to issue a search warrant may not be "a mere ratification of the bare conclusions of others," *Illinois v. Gates*, 462 U.S. 213, 239 (1983), nor "serve merely as a rubber stamp for the police," *Aguilar v. Texas*, 378 U.S. 108, 111 (1964). Given the neutral and detached function of the judiciary, the magistrate is expected to be more sensitive to, and knowledgeable of, the Fourth Amendment's requirements compared to a law enforcement officer without legal training. *See McDonald*, 335 U.S. at 455–56 ("The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals."). This is especially the case considering the diverging institutional incentives between a judge and a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). In short, we trust magistrates to "conscientiously review the sufficiency of affidavits on which warrants are issued." *Gates*, 462 U.S. at 239.

The judge who considered the warrant application in this case thus could, and should, have assessed the affidavit carefully and identified its deficiencies and the overbreadth of the search request. The judge then ought to have inquired whether the applicant could have complied with the requirements of the Fourth Amendment

with a more specific affidavit and a correspondingly targeted search request. This dialog would have encouraged the applicant to make a submission that would have shown the existence of probable cause to believe appellant's cell phone contained the relevant locational and communications data I have described above. Then, the court could have issued a suitably particularized warrant authorizing the police to conduct a focused search for that data, and such valuable evidence, having been obtained constitutionally, would not have been subject to suppression under the Fourth Amendment.